# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AVCO CORPORATION,

    Plaintiff-Counterclaim Defendant,

    v.

TURN AND BANK HOLDINGS, LLC,
AND PRECISION AIRMOTIVE, LLC,

    Defendants-Counterclaim
        Plaintiffs,

    v.

AVSTAR FUEL SYSTEMS, INC.

    Counterclaim Defendant.

No. 4:12-CV-01313

(Judge Brann)

## MEMORANDUM OPINION

### APRIL 9, 2018

AVCO Corporation ("AVCO") and AVStar Fuel Systems, Inc. ("AVStar") moved for summary judgment against Turn and Bank Holdings, LLC ("TNB") and Precision Airmotive, LLC ("Precision NC"). TNB and Precision NC, in turn, moved for summary judgment against AVCO and AVStar. For the reasons that follow, the motion by AVCO and AVStar will be denied, and the motion by TNB and Precision NC will be granted.

## I.    BACKGROUND

### A.    Lycoming Engines

Lycoming Engines, a division of AVCO, manufactures piston engines for various aircraft.[1]  While some of Lycoming's engine models utilize a carburetor, others use a fuel injection system.  Lycoming does not manufacture its own fuel injection systems; instead, it purchases them from other manufacturers.

For decades, Lycoming purchased a certain type of fuel injection system from Precision NC and its predecessors-in-interest.[2]  In 2010, however, Lycoming began to purchase that same type of system from AVStar.  It is unproblematic that both systems relied on the same technology, since the technology at issue is apparently not protected by any patent.[3]  What *is* problematic, however, is the fact that AVStar, in naming its systems, decided to mirror the model-naming conventions utilized by Precision NC and its forbearers.  That decision, in fact, is the genesis of this lengthy and contentious lawsuit.

### B.    Fuel Injection Systems and the Bendix Corporation

Fuel injection systems operate by delivering a mixture of fuel and air to aircraft engines.[4]  To ensure optimal engine performance, however, the amount of

---

[1]    Ex. 1 to AVCO's Motion for Summary Judgment (Deposition of Scott Grafenauer) at 34-35.

[2]    Ex. B to TNB's Motion for Summary Judgment (Deposition of Ronald Weaver) at 229; Ex. C to TNB's Motion for Summary Judgment (Deposition of Michael Everhart) at 203.

[3]    Ex. 20 to AVCO's Motion for Summary Judgment (Deposition of Roger Hall) at 65.

[4]    ECF No. 25 (Declaration of Roger Hall) ¶ 4.

fuel delivered must be carefully and precisely regulated. In the middle of the 20th century, a company known as the Bendix Corporation created a fuel injection system that accomplished this regulation by measuring the force of the air being pulled into the engine.[5] As the force of the air fluctuated (which force was measured by a device known as a "venturi"), so did the amount of fuel delivered. These fuel injection systems became known as "servos,"[6] and the first generation of them were given model numbers beginning with the letters "RS."[7] Bendix eventually improved the design of the "RS" servos by eliminating one of the intermediate valves in the device, leading to a more direct-acting chain of operation between the venturi and the actual fuel delivery.[8] Bendix gave these updated servos model numbers beginning with the letters "RSA"—*e.g.*, RSA-5AD1 and RSA-10AD1.[9]

---

[5] Ex. 8 to AVCO's Motion for Summary Judgment (Affidavit of Donald Rivera) ¶ 14.

[6] *See, e.g.*, *id.* ¶ 9 (referring to Bendix's RSA-labelled fuel injection systems as "servos"); *see also* Ex. 3 to AVCO's Motion for Summary Judgment (Deposition of Kent Kelly) at 37 ("the word 'servo' . . . immediately bring[s] to mind the RSA system").

Although not definitively clear from the record, "servo" presumably is short for "servomechanism," which describes types of mechanical devices that utilize a feedback loop to monitor and control a system's performance. *See, e.g.*, *Pfund v. United States*, 40 Fed. Cl. 313, 329 (Fed. Cl. 1998).

[7] Ex. 8 to AVCO's Motion for Summary Judgment (Affidavit of Donald Rivera) ¶ 12.

[8] *Id.* ¶ 15.

[9] *Id.* ¶¶ 9, 16-17.

Bendix manufactured its RSA-labelled servos until it sold the rights to the entire product line to Precision Airmotive Corporation ("Precision WA")[10] in 1988.[11] Precision WA, in turn, manufactured RSA-labelled servos until selling all of its assets (including the servo product line) to TNB in 2013.[12] Since that 2013 sale, RSA-labelled servos have been manufactured by Precision NC pursuant to a licensing agreement between it and TNB.[13]

### C.    AVStar's Servos

Sometime around 2004 or 2005, however, AVStar began to reverse-engineer some of the RSA-labelled servos for possible manufacture and sale to a company called Superior Air Parts, which dealt in replacement parts for Lycoming engines.[14] Although this "opportunity" between AVStar and Superior eventually "eroded,"[15] AVStar was later asked by Lycoming itself to complete the reverse-engineering

---

[10]   It should be emphasized that Precision WA is an entity separate and distinct from Precision NC, a party to this case.

[11]   Ex. 34 to AVCO's Motion for Summary Judgment (Asset Purchase Agreement between Allied-Signal Inc. and P.A.C. Holdings, Inc., Skypac Parts and Supply, Inc., and Precision Airmotive Corp.).

[12]   Ex. 42 to AVCO's Motion for Summary Judgment (Asset Purchase Agreement between Precision WA and TNB).

[13]   Ex. 5 to AVCO's Motion for Summary Judgment (Trademark License Agreement).

[14]   Ex. 36 to AVCO's Motion for Summary Judgment (Deposition of Ronald Weaver) at 65.

[15]   *Id.* at 71.

process and to manufacture copies of a number of the RSA-labelled servos for installation and use in Lycoming's new engines.[16]

In 2007 and 2008, AVStar and Lycoming signed a series of agreements codifying this arrangement,[17] which arrangement included an obligation on the part of AVCO to pay nearly $2 million to AVStar in furtherance of such "fuel systems development"[18] and an obligation on the part of AVStar to use the same RSA-based model numbers used by Precision WA.[19] In 2010, AVStar began selling its

---

[16] *Id.* at 72. *See also* Ex. 32 to AVCO's Motion for Summary Judgment (Deposition of David Peter Rose) at 85 (noting that "the scope of the project grew considerably when Lycoming became involved").

[17] Ex. 37, 37A, 38, and 39 to AVCO's Motion for Summary Judgment ("Memorandum of Agreement"; "Non-Disclosure Agreement"; "Fuel Systems Development Agreement"; and "Master Supply Agreement").

[18] Ex. 38 to AVCO's Motion for Summary Judgment ("Fuel Systems Development Agreement").

[19] Ex. 32 to AVCO's Motion for Summary Judgment (Deposition of David Peter Rose) at 62 (agreeing that Lycoming "directed AVStar" to use the RSA marks); *id.* at 63 (agreeing that Lycoming "instruct[ed]" AVStar to use "the RSA model designators"); Ex. G to TNB's Motion for Summary Judgment (Deposition of Ronald Weaver) at 372-73 ("Lycoming did direct, for their program, for us to use the RSA model designators.").

To counter this evidence, AVCO and AVStar point to portions of Mr. Weaver's deposition wherein he testified that "there was never, ever a discussion" with Lycoming about using the RSA marks, and that there "was never even a thought of using or not using" the RSA marks. Ex. B to TNB's Motion for Summary Judgment (Deposition of Ronald Weaver) at 112; *see also id.* at 211-12 (noting that use of the RSA marks was "nothing that was up for discussion"). In light of Mr. Weaver's testimony that "Lycoming did direct, for their program, for [AVStar] to use the RSA model designators," Ex. G to TNB's Motion for Summary Judgment (Deposition of Ronald Weaver) at 372-73, and AVStar's apparent belief that the FAA *required* AVStar to use the RSA marks, *see, e.g.*, Ex. B to TNB's Motion for Summary Judgment (Deposition of Ronald Weaver) at 112 ("When you look at RSA that is part of the type certificate and the . . . design by Lycoming, it's in their design."); Ex. H to TNB's Motion for Summary Judgment (Deposition of Peter Rose) at 62 (agreeing that Lycoming "directed AVStar to use what was on the type certificates" and that "AVStar had no choice in the matter"), Mr. Weaver's insistence that there was no "discussion" on this

RSA-labelled servos to Lycoming,[20] and in August 2012, Lycoming sold its first engine containing an AVStar-manufactured, RSA-labelled servo.[21]

## D.    FAA Approval

It should be noted that Lycoming's switch to AVStar as its new servo supplier was not made as easily as one might, for example, switch to a new brand of toothpaste.  The Federal Aviation Administration ("FAA") heavily regulates the aviation industry, and when it approves aircraft engine designs, it issues something called a "type certificate" and a corresponding "type certificate data sheet" ("TCDS").[22]  The TCDS "gives high level design information" about approved engines.[23]

Before AVStar entered the servo market, Precision WA had FAA approval to manufacture servos for Lycoming's engines, which approval was reflected in

---

topic can only be viewed as reflecting his belief that the use of the RSA marks was not up for negotiation with AVCO.

[20]  Ex. 40 to AVOC's Motion for Summary Judgment (AVStar Fuel Systems, Inc.—Sales Analysis Report).

[21]  Ex. 36 to AVCO's Motion for Summary Judgment (Deposition of Ronald Weaver) at 158.

[22]  Ex. 28 to AVCO's Motion for Summary Judgment (Deposition of Elizabeth Erickson) at 59; Ex. 30 to AVCO's Motion for Summary Judgment (Preliminary Injunction Hearing Testimony of Marian Folk) at 50; Ex. 31 to AVCO's Motion for Summary Judgment (Deposition of Michael Kraft) at 54-55;

[23]  Ex. 30 to AVCO's Motion for Summary Judgment (Preliminary Injunction Hearing Testimony of Marian Folk) at 50.

Lycoming's TCDS.[24]  The TCDS, for example, indicated that Lycoming's "IO-360-A1A" model engine would be equipped with a "PAC RSA-5AD1" fuel injector, and in a footnote indicated that "PAC" stood for "Precision Airmotive."[25] After AVStar gained FAA approval to manufacture Lycoming's servos,[26] the "PAC" designation was removed from the TCDS,[27] which now identifies IO-360-A1A's servo simply as "RSA-5AD1."[28]

It should be noted that, while it is true that the RSA marks *do* appear in Lycoming's TCDS, AVCO has cited absolutely no legal authority—nor has this Court been able to find any—demonstrating that the FAA would have *required* AVStar to use the same model numbers as Precision WA when it began supplying servos to Lycoming.

### E.    Model Numbers

All of the RSA model numbers consist of  (1) the letters "RSA," (2) a dash, (3) a one- or two-digit number, (4) two more letters, and (5) a one-digit number— in that order  (*e.g.*, "RSA-5AD1," "RSA-10ED2").  There is some consensus, but also some dispute, over these model numbers' precise meaning.  The parties agree,

---

[24]   Ex. 12 to Ex. C of TNB's Motion for Summary Judgment (Type Certificate Data Sheet No. 1E10—January 8, 2009) at 14.

[25]   *Id.*

[26]   Ex. 30 to AVCO's Motion for Summary Judgment (Preliminary Injunction Hearing Testimony of Marian Folk) at 49.

[27]   Ex. 29 to AVCO's Motion for Summary Judgment (Deposition of Marian Folk) at 169-70.

[28]   Ex. 13 to Ex. C of TNB's Motion for Summary Judgment (Type Certificate Data Sheet No. 1E10—May 24, 2012) at 14.

for example, that the numbers and letters after the dash indicate different functional or structural aspects of the servos.[29]

The parties disagree, however, on the meaning of the "RSA" prefix. AVCO points to the affidavit of Donald Rivera, an engineer who worked at Bendix during the 1970s and 1980s.[30] He claims that "[t]he letters 'RS' connote that fuel 'regulation' is accomplished by 'servo,'"[31] and that the addition of "[t]he letter A was used to connote 'direct acting or 'actuation,'"—*i.e.*, to indicate that the RSA-labelled servos do not have one of the intermediate valves present in the RS-labelled servos. [32] AVCO's argument, then, is that "RSA" is an abbreviation for either "Regulated Servo Actuation"[33] or "Regulated Servo Actuated."[34] TNB, on the other hand, argues that the letter combinations "RS" and "RSA" are

---

[29] Ex. 14 to AVCO's Motion for Summary Judgment ("Servo Regulator Injector System Model Designation").

[30] Ex. 8 to AVCO's Motion for Summary Judgment (Affidavit of Donald Rivera) ¶¶ 4-5.

[31] *Id.* ¶ 16. Based on this logic, one may question why Bendix didn't use the label "SR," which might conveniently indicate that the fuel injectors were "Servo-Regulated"—*i.e.*, that Regulation is accomplished by a Servo. In deposition, Mr. Rivera justified this incongruity by stating that Bendix would regularly "reverse the nomenclature in [their] bill of materials." Ex. 16 to AVCO's Motion for Summary Judgment (Deposition of Donald Rivera) at 99. For example, Bendix would, he claimed, refer to a "slotted head screw" as a "screw, slotted head." *Id.*

[32] *Id.* ¶ 17. ("[M]etering of the fuel is done directly by <u>actuation</u> due to the pressure differential created by air passing through and around the Venturi.") (emphasis in original).

[33] AVCO's Brief in Support of its Motion for Summary Judgment at 2.

[34] *Id.* at 9.

meaningless—not acronyms—and were essentially arbitrarily chosen because they were alphabetically next in the line of Bendix model numbers.[35]

## F. Part Numbers

Whatever the model numbers' precise meaning, it is undisputed that each model number represents not a specific servo but rather a "family" of servos sharing certain general functional characteristics.[36]

Every engine has unique fuel injection needs—*i.e.*, has a unique "fuel curve"—and although two different engines might both benefit from the functional characteristics of, say, an RSA-5AD1 servo, the two engines will have slightly different fuel curves, necessitating slightly different servos.[37] To keep things straight, when Precision NC and AVStar design a servo to match a fuel curve, they assign the resulting product a unique *part* number in addition to its general *model* number.[38] Numerous servos—each compatible with a different fuel curve and, therefore, bearing a different part number—may share the same model number;

---

[35] Ex. D to TNB's Motion for Summary Judgment (Declaration of Michael Allen) ¶ 10.

[36] Ex. 30 to AVCO's Motion for Summary Judgment (Preliminary Injunction Hearing Testimony of Marian Folk) at 37-43, 66-68.

[37] *Id.*

[38] *Id.* In addition to utilizing the same *model* numbers as Bendix, Precision WA, and Precision NC, AVStar has apparently also utilized nearly the same *part* numbers, simply adding an "AV" prefix "to indicate that [the] unit is designed to be equivalent to the Precision setting number." *Id.* at 45. These semi-shared part numbers, however, are not at issue in the instant dispute.

Lycoming, then, cannot simply call up Precision NC or AVStar and ask for an RSA-5AD1.[39]

### G. Registration of the RSA Marks

On October 19, 2010, several of the RSA model numbers[40] were registered on the United States Patent and Trademark Office's ("USPTO") Supplemental Register.[41]  On January 14, 2014, the "RSA" mark itself was registered on the USPTO's Principal Register.[42]  And on January 10, 2017, three of the previously-registered RSA model numbers[43] were moved to the USPTO's Principal Register.[44]

### H. Procedural History

On July 6, 2012, AVCO initiated the instant suit.[45]  Its operative complaint (1) requests a declaration that its use of the RSA marks does not violate any rights that TNB or Precision NC may have under federal or state trademark law and (2) seeks to cancel, on the basis of fraud, the RSA marks' registration on the Principal

---

[39]  *Id.*

[40]  RSA-AB1; RSA-5AD1; RSA-5AD2; RSA-7AA1; RSA-7DA1; RSA-10AD1; RSA-10DB1; RSA-10ED1; RSA-10ED2.

[41]  Ex. 7 to AVCO's Motion for Summary Judgment (Registration Certificates from the USPTO).

[42]  Ex. 6 to AVCO's Motion for Summary Judgment (Registration Certificates from the USPTO).

[43]  RSA-5AD1; RSA-10AD1; RSA-10ED1.

[44]  Ex. 6 to AVCO's Motion for Summary Judgment (Registration Certificates from the USPTO).

[45]  ECF No. 1.

and Supplemental Register.[46]    TNB and Precision NC's answer raises counterclaims (against AVCO and impleaded third-party defendant AVStar) for trademark infringement and unfair competition, under both federal and state law.[47]

On August 25, 2017, the parties filed cross motions for summary judgment.[48]    AVCO and AVStar's motion seeks one or more of the following declarations:   (1) that the RSA marks are generic; (2) that the RSA marks are descriptive without secondary meaning; (3) that AVCO and AVStar's use of the RSA marks is not likely to cause consumer confusion; or (4) that AVCO and AVStar's use of the RSA marks is permissible fair use.[49]  TNB and Precision NC's motion seeks rulings (1) that the RSA marks are not generic; (2) that AVCO and AVStar's use of the RSA marks is not permissible fair use; and (3) that AVCO and AVStar are liable for infringing the RSA marks.[50]  The parties' motions also seek judgment in their respective favors on the trademark registration fraud claim.

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[46]   ECF No. 138 ¶¶ 41-75.

[47]   ECF No. 144 ¶¶ 41-62.

[48]   ECF Nos. 331 and 336.

[49]   ECF No. 331.

[50]   ECF No. 336.

matter of law."[51]  A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[52]  To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[53]  When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[54]

### B.    Trademark Infringement Claims

TNB and Precision NC's counterclaims are brought under two different provisions of the Lanham Act—15 U.S.C. § 1114 and 15 U.S.C. § 1125(a)—as well as under Pennsylvania common law.  Because the counterclaims are, at heart, all claims for trademark infringement,[55] this Court will consider them all under the

---

[51]    Federal Rule of Civil Procedure 56(a).

[52]    *Lichtenstein v. Univ. of Pittsburgh Medical Ctr.*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986).

[53]    Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[54]    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[55]    In their Motion for Summary Judgment and accompanying Brief, TNB and Precision NC attempt to construe their unfair competition counterclaims as claims for false advertising—based on AVStar advertisements that refer to AVStar as "THE NEW OEM" of Lycoming's servos—and attempt to "reserve" their right to take those counterclaims to trial.  ECF No. 336 at 1 n.1; ECF No. 337-28 at 19 n.6.  TNB and Precision NC's operative answer, however, frames the unfair competition counterclaims exclusively in terms of AVStar's use of the RSA marks.  ECF No. 144 ¶¶ 49-62.  This Court, therefore, will construe the unfair competition counterclaims as claims for trademark infringement and will treat TNB and Precision's motion as one for summary judgment on all of its counterclaims against AVCO and AVStar.

same legal standards.[56]  To prevail, then, TNB and Precision NC must show, as a matter of law, (1) that the RSA marks are valid and legally protectable; (2) that they own the RSA marks; and (3) that AVStar's use of the RSA marks is likely to create confusion concerning the origin of AVStar's servos.[57]  TNB and Precision NC must also show, as a matter of law, that AVStar's use of the RSA marks is not a protected "fair use."

## C.    Trademark Validity

For a trademark to be valid and legally protectable, it must be distinctive— *i.e.*, it "must be capable of distinguishing the [owner's] goods from those of others."[58]  To guide this "distinctiveness" inquiry, courts first classify the mark as either (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful.[59] Marks that are either suggestive, arbitrary, or fanciful are "inherently" distinctive and, therefore, are automatically valid and legally protectable.[60]  Generic marks, on the other hand, are by definition *in*distinctive and, therefore, are *never* valid or legally protectable.[61]

---

[56]  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000); *Standard Terry Mills, Inc. v. Shen Mfg. Co.*, 803 F.2d 778, 780 n.4 (3d Cir. 1986).

[57]  *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 192 (3d Cir. 1990).

[58]  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

[59]  *Id.*

[60]  *Id.*

[61]  *Id.*

In the middle of these two poles lay descriptive marks. These marks are distinctive (and valid and legally protectable) only if they have come to "identify a particular source"—*i.e.*, only if they have acquired what is known as "secondary meaning."[62] Otherwise, they join generic marks in the invalid and unprotected pile.[63]

TNB and Precision NC do not claim here that the RSA marks are suggestive, arbitrary, or fanciful. Therefore, to prevail on their claim for trademark infringement, they must show that the marks are either (1) not generic or (2) descriptive with an acquired secondary meaning.

### D.    Generic Marks

The United States Court of Appeals for the Third Circuit has identified two tests—the "primary significance" test and the "*Canfield*" test—for determining whether a mark is generic. This Court believes that, in these circumstances, the "primary significance" test applies. Under either test, however, a jury viewing the record compiled here could only conclude that the RSA marks are *not* generic. Therefore, summary judgment will be granted to TNB and Precision NC on this issue.

Generic terms are not protectable as trademarks because they simply "refer[] to the genus of which the particular product is a species" and, consequently, do not

---

[62]    *Id.* at 769.

[63]    *Id.*

distinguish goods originating from different sources.[64]  A soft drink producer, for example, cannot trademark the word "cola" standing alone, because the word "cola" refers, generically, to a carbonated drink with certain flavor characteristics.[65]  On the other hand, The Coca-Cola Company and PepsiCo have been able to trademark "Coca-Cola" and "Pepsi Cola," respectively, because "the primary significance of th[ose] term[s] in the minds of the consuming public is not the product but the [respective] producer[s]."[66]  This is known as the "primary significance test,"[67] and it should be intuitively understood by anyone who has ever ordered a "Coke" at a restaurant and been greeted with the response:  "Is Pepsi OK?"

It is sometimes difficult, however, to determine whether a given term refers to a "genus" or to a "species," especially when the term has come to be associated with a specific product *as well as* with a specific producer.  In cases where this question arises, the Third Circuit has created an alternative to the primary significance test, which states that

> [i]f a producer introduces a product that differs from an established product class in a particular characteristic, and uses a common descriptive term of that characteristic as the name of the product, then the product should be considered its own genus.  Whether the term

---

[64]  *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 298 (3d Cir. 1986).

[65]  *E.T. Browne Drug Co. v. Cococare Products, Inc.*, 538 F.3d 185, 192 (3d Cir. 2008).

[66]  *A.J. Canfield Co.*, 808 F.2d at 299.

[67]  *Id.*

that identifies the product is generic then depends on the competitors' need to use it. At least, if no commonly used alternative effectively communicates the same functional information, the term that denotes the product is generic.[68]

This test was first stated in *A.J. Canfield Co. v. Honickman*,[69] and has therefore come to be known as the "*Canfield* test."[70] Under it, a term may be considered generic no matter how strong the mental association between the term and a single producer—*i.e.*, no matter how much "'de facto' secondary meaning" a term has acquired—because "even complete success in securing public identification cannot deprive competing manufacturers of the product the right to call an article by its name."[71]

As an initial matter, there is overwhelming evidence showing that, in minds of the relevant consumers,[72] the primary significance of the RSA marks is to refer

---

[68] *Id.* at 305-06.

[69] *Id.*

[70] *See, e.g.*, *E.T. Browne Drug Co.*, 538 F.3d at 192.

[71] *Id.* at 297.

The concept of "de facto" secondary meaning of a *generic* term must be carefully distinguished from the secondary meaning that might be acquired by a *descriptive* term. See *infra* § II.E. AVCO and AVStar repeatedly argue that, since Bendix and Precision WA were the only producers of RSA-labelled servos for many decades, any secondary meaning the RSA marks may have acquired should be considered "de facto" secondary meaning and ignored as irrelevant. AVCO and AVStar misunderstand the concept of "de facto" secondary meaning. This doctrine arises *only* in the concept of *generic* terms. *See, e.g.*, McCarthy on Trademarks and Unfair Competition (5th ed. 2018) § 12:47.

[72] *Berner Intern. Corp. v. Mars Sales Co.*, 987 F.2d 975, 982 (3d Cir. 1993) ("The critical question is whether the mark is descriptive to the prospective purchasers of the product.")

Here, the class of relevant consumers includes aircraft engine manufacturers, airframe manufacturers who purchase those engines, purchasers of completed aircraft, aircraft part distributors, and mechanics and others involved in the repair and overhaul of aircraft

to Bendix and its successors-in-interest.[73]  In response, AVCO and AVStar point to

Donald Rivera's affidavit, which states that the RSA marks "are a language of the

industry that describe[] the particular assemblage and sizes of parts that make up

the servo."[74]  While that may be true—while Mr. Rivera and others may use the

RSA marks as a form of "shorthand"[75]—such a *descriptive*[76] use of the RSA marks

does not make them generic,[77] nor does it in any way allow the inference that the

*primary* significance of the marks is to generally refer to a servo utilizing certain

technology.   A jury applying the primary significance test, then, could only

conclude that the RSA marks are *not* generic.

AVCO and AVStar suggest that the *Canfield* test applies and that they are

entitled to summary judgment under it—or, at the very least, that its application

---

engines.   *See* AVCO's Brief in Support of its Motion for Summary Judgment at 26; Precision's Opposition to AVCO's Motion to Summary Judgment at 31.

[73]   *See*  TNB's Statement of Facts in Support of its Motion for Summary Judgment ¶¶ 45-47 and accompanying exhibits.

[74]   Ex. 8 of AVCO's Motion for Summary Judgment (Affidavit of Donald Rivera) ¶ 10.

[75]   *Id.* ¶ 18.

[76]   *See, e.g.*, *id.* at ¶ 10 ("Indeed, it is my experience in the industry that these terms are used to *describe* the devices much in the way that golf clubs are assigned numeric values based upon their characteristics . . . .") (emphasis added); ¶ 11 (the RSA marks are "used to *describe* [the servos] over many decades") (emphasis added); ¶ 20 (the RSA marks were "a means of *describing* the particular technical configurations of various devices") (emphasis added).

[77]   McCarthy on Trademarks and Unfair Competition (5th ed. 2018) § 11:37 ("Words and numbers that directly tell of a feature of the goods are clearly 'descriptive.' . . . Even an arbitrary word or number is still 'descriptive' if it is used only to designate ('describe') a kind or style, model, type or size, rather than perform the trademark purpose of identifying and distinguishing a source." *See also infra*, § II.B (describing descriptive trademarks).

should prevent entry of summary judgment in favor of TNB and Precision NC. AVCO and AVStar, however, do a rather poor job of explaining its application here. Even speculating how it *might* apply, this Court can only conclude that, as under the primary significance test, the RSA marks are *not* generic as a matter of law.

The *Canfield* test, by its very terms, applies only when "a producer introduces a product that differs from an established product class in a particular characteristic, and uses a common descriptive term of that characteristic as the name of the product."[78] Assuming that the "established product class" is fuel injectors, this Court struggles to understand how "RSA" is a "common descriptive term" for any characteristic that made Bendix's fuel injectors different from its competitors' fuel injectors—even if one assumes that "RSA" stands for "regulated servo actuation" or "regulated servo activated."

TNB and Precision NC, after all, are *not* seeking trademark protection for simply "RS," which, according to Mr. Rivera's (backwards) explanation,[79] stands for "servo-regulated." If they *were* seeking such protection, AVCO and AVStar might conceivably argue that "servo-regulated" was merely a "common[,] descriptive" way to indicate the "particular characteristic" (*i.e.*, regulation by servo) that made Bendix's product different from "established" fuel injectors

---

[78] *A.J. Canfield Co.*, 808 F.2d at 305-06.

[79] *See supra* note 31.

(which were not regulated by servos). Instead, TNB and Precision NC are seeking protection for "RSA" in its entirety. But even accepting Mr. Rivera's claim that the "A" indicates that "metering of the fuel . . . is done directly by <u>actuation</u> due to the pressure differential created by air passing through and around the Venturi,"[80] and, consequently, accepting AVCO and AVStar's claim that RSA stands for "regulated servo actuation" or "regulated servo actuated," no jury could conclude that either of those phrases are a "*common*" or a "*descriptive*" term for the characteristics that distinguish Bendix's fuel injection system. There is simply too great a mental leap between those phrases and how the technology at issue works.

Furthermore, AVCO and AVStar cannot in good faith argue that they have a "need" to use the RSA marks, or that there is no "commonly used alternative" that "effectively communicates the same information," since their papers *repeatedly* refer to products being produced by AVStar as simply "servos."[81] Summary judgment, then, will be granted in TNB and Precision NC's favor on the issue of genericness.

---

[80] Ex. 8 to AVCO's Motion for Summary Judgment (Affidavit of Donald Rivera) ¶ 17.

[81] *See, e.g.*, Statement of Material Facts in Support of AVCO's Motion for Summary Judgment ¶ 12 ("RSA is synonymous with servo.").

## E.    Descriptive Marks

Model numbers such as the RSA marks are commonly considered descriptive marks,[82] and are therefore valid and protectable as trademarks only if they have acquired "secondary meaning"—*i.e.*, only if they are "interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services."[83]  Such secondary meaning is measured "at the time and place that the [alleged infringer] began use of the mark,"[84] and may be proven by considering, *inter alia*,

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion.[85]

There is comprehensive, undisputed evidence on nearly all of these factors working in TNB and Precision NC's favor.  Bendix, for example, began labelling its fuel injectors with the RSA marks as early as 1961,[86] nearly fifty years before AVStar began doing so in 2010.[87]  During that time period, Bendix and its

---

[82]   McCarthy on Trademarks and Unfair Competition (5th ed. 2018) § 11:38.

[83]   *Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

[84]   *Id.*

[85]   *Id.*.

[86]   *See, e.g.*, Ex. 10 to AVCO's Motion for Summary Judgment ("Bendix RSA Fuel Injection System Preliminary Service Manual" dated December 1961).

[87]   *See* 15 U.S.C. § 1052(f) (noting that the USPTO "may accept as prima facie evidence that the mark has become distinctive, as use on or in connection with the applicant's goods in

successors-in-interest utilized the RSA marks consistently,[88] exclusively,[89] and prominently,[90] advertising in aviation magazines and at trade shows[91] while gaining recognition by trade journals.[92]   Additionally, AVStar's copying of the RSA marks was intentional,[93] and has resulted in several instances of actual confusion.[94]   Therefore, this Court must conclude that, as a matter of law, the

---

commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the *five* years before the date on which the claim of distinctiveness is made") (emphasis added).

[88] *See, e.g.*, Ex. 17 to AVCO's Motion for Summary Judgment ("Bendix RSA Fuel Injection System Preliminary Service Manual" dated November 1963); Ex. 18 to AVCO's Motion for Summary Judgment ("RSA-5 and RSA-10 Fuel Injection Systems Operation and Service Manual" labelled with the Bendix mark and dated November 1968); Ex. 19 to AVCO's Motion for Summary Judgment ("RSA-5 and RSA-10 Fuel Injection Systems Operation and Service Manual" labelled with the Bendix mark, dated October 1976)

[89] Ex. B to TNB's Motion for Summary Judgment (Deposition of Ronald Weaver) at 229.

[90] *See, e.g.*, Ex. 19 to AVCO's Motion for Summary Judgment ("RSA-5 and RSA-10 Fuel Injection Systems Operation and Service Manual" labelled with the Bendix mark and featuring a large "RSA" on the cover).

[91] Ex. JJ to TNB's Motion for Summary Judgment (Deposition of Alan Jesmer) at 14-15.

[92] *See* Ex. F (Sub-Exhibit 17) to TNB's Motion for Summary Judgment (article from "Aircraft Maintenance Technology" publication of November 1997) at 1-2.

[93] *See supra*, note 19; *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 297 (3d Cir. 1991) (noting that "evidence of copying" is a "vitally important factor" in determining secondary meaning).

[94] *See, e.g.*, Ex. R to TNB's Motion for Summary Judgment (Deposition of Peter Nielson) at 64-65 ("I get instances of confusion all the time. . . . I'm constantly asked about the relationship between AVStar and Precision, whether we own AVStar or AVStar owns us, or one is a division of the other, whether we're the same company, how the products relate, whether they can use the same parts, whether they can use the same service data manuals."

Such evidence of actual confusion is "strong evidence of secondary meaning."  McCarthy on Trademarks and Unfair Competition (5th ed. 2018) § 15:37.

descriptive RSA marks have acquired secondary meaning and that they are valid and protectable under federal and state trademark law.

## F.    Ownership of Marks

Registration of trademarks on the USPTO's Principal Register acts as "prima facie evidence of . . . the registrant's ownership of" those marks.[95]  All of the RSA marks currently used by AVStar have been registered by TNB on the Principal Register.[96]

If this were insufficient, the Third Circuit has noted that "the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce."[97]  There is no dispute that Bendix was the first party to use the RSA marks, and that Bendix,[98] and then Precision WA, used the marks continuously up

---

[95]   15 U.S.C. § 1115(a).

[96]   Although some of the RSA marks appear only on the Supplemental Register—which registration does not create a presumption of validity—all of the marks used by AVStar (*i.e.*, RSA-5AD1, RSA-10AD1, and RSA-10ED1) appear on the Principal Register.  *See, e.g.*, Ex. D to TNB's Motion for Summary Judgment (Declaration of Michael Allen) ¶ 12; Ex. 6 to AVCO's Motion for Summary Judgment (Registration Certificates from the USPTO).

[97]   *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 (3d Cir. 1991).

[98]   AVCO argues that Bendix could not have had any trademark rights in the RSA marks because there was no evidence that Bendix treated the RSA marks as trademarks.  This assertion is belied by the actual evidence.  *See, e.g.*, Ex. 19 to AVCO's Motion for Summary Judgment ("RSA-5 and RSA-10 Fuel Injection Systems Operation and Service Manual" labelled with the Bendix mark, dated October 1976, and featuring a large "RSA" on the cover).  AVCO also points to Bendix's failure to register the marks with the USPTO.  Registration, however, is neither necessary nor sufficient to establish ownership of a trademark.  McCarthy on Trademarks and Unfair Competition (5th ed. 2018) § 19:1.75 ("Ownership [of a trademark] flows from use, not from registration . . . Registration cannot wipe out the prior use-based common law rights of another.").

to 2013, when that TNB purchased them.[99]   Therefore, ownership by TNB and

Precision NC is established as a matter of law.

### G.    Likelihood of Confusion

An alleged infringer's use of another's marks creates a "likelihood of

confusion" when "consumers viewing the mark would probably assume that the

product or service it represents is associated with the source of a different product

or service identified by a similar mark."[100]   The Third Circuit uses the "*Lapp*"

factors[101] to measure such likelihood of confusion,[102] which factors include

> (1) the degree of similarity between the owner's mark and the alleged
> infringing mark; (2) the strength of the owner's mark; (3) the price of
> the goods and other factors indicative of the care and attention
> expected of consumers when making a purchase; (4) the length of
> time the defendant has used the mark without evidence of actual
> confusion arising; (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion; (7) whether the goods, though
> not competing, are marketed through the same channels of trade and
> advertised through the same media; (8) the extent to which the targets
> of the parties' sales efforts are the same; (9) the relationship of the
> goods in the minds of consumers because of the similarity of function;
> (10) other facts suggesting that the consuming public might expect the
> prior owner to manufacture a product in the defendant's market, or
> that he is likely to expand into that market.[103]

---

[99]  *See Premier Dental Products Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 853 (3d
Cir. 1986) ("following a proper assignment [of a trademark], the assignee steps into the shoes
of the assignor").

[100]  *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992).

[101]  So named because they were established in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d
Cir. 1983)

[102]  *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000).

[103]  *Id.*

However, elaborating on the "likelihood of confusion" test, the Third Circuit has also noted (1) that "when the goods involved in a trademark infringement action directly compete with each other, a court need rarely look beyond the mark itself to determine the likelihood of confusion,"[104] and (2) that even a small amount of evidence of *actual* confusion is "highly probative of the likelihood of confusion."[105]  Here, AVStar is directly competing with Precision NC in the servo market for the same customers and is deliberately[106] using *identical* model numbers to do so,[107] and evidence of *actual* confusion has already been demonstrated.  As a matter of law, then, AVStar's use of the RSA marks creates a likelihood of confusion.

---

[104] *Id.* at 211; *see also* McCarthy on Trademarks and Unfair Competition (5th ed. 2018) § 23:20 ("Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports.  Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement.")

[105] *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 720 (3d Cir. 2004).

[106] "[E]vidence of intentional, willful, and admitted adoption of a mark closely similar to the existing mark[] weighs strongly in favor of finding the likelihood of confusion." *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.*, 269 F.3d 270, 286 (3d Cir. 2001).

[107] Although AVCO and AVStar note that all of AVStar's servos are labelled with the "AVStar" name, this does not reduce the likelihood of confusion.  Although "[u]se of a strong, well-known [house]mark as part of a composite name reduces the likelihood that the remainder of the composite name will create a commercial impression distinct from that mark," *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 218 (3d Cir. 2000), there is no evidence that "AVStar" is "strong" or "well-known."

More importantly, there is a conceptual distinction between affixing the "AVStar" mark to the servo itself and affixing it to the model numbers at issue here.  This would be a different case entirely if AVStar were labelling its servo models, say, as "AVS-RSA-5AD1" or "AVS-RSA-10AD1."  *See, e.g., Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384 (1995).

### H. Fair Use

Even though TNB and Precision NC have established the elements necessary to prevail on their trademark infringement claims, AVCO and AVStar have raised the defense of "fair use." On the evidence presented, however, AVCO and AVStar are, as a matter of law, unable to establish either "nominative" or "classic" fair use. Therefore, this Court will grant summary judgment in favor of TNB and Precision NC on this issue.

Nominative fair use occurs when the alleged infringer "uses a trademark to describe the [trademark owner's] product rather its own"[108]—for example, when a car mechanic advertises that he repairs "Volkswagen" cars.[109] AVStar is not using the RSA marks to describe TNB or Precision NC's servos—it is not, for example, advertising its servos as "RSA-like" or "functionally identical to model RSA-XXXX"—but is rather using the RSA marks directly to label its own products. This is not nominative fair use.

Classic fair use occurs when an alleged infringer utilizes another's trademark, in good faith, merely to describe their own product and not as a trademark.[110] Here, AVStar is deliberately using the RSA marks in exactly the same manner that TNB and Precision NC are using the marks—*i.e.*, to label

---

[108] *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 234 (3d Cir. 2005).

[109] *Id.* at 214.

[110] *Institute for Scientific Information, Inc. v. Gordon and Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1008 (3d Cir. 1991).

various servo models—therefore, it cannot be said either that AVStar's use is in good faith or is used in a merely descriptive sense. Because of this, and because of the extensive confusion evidence discussed *supra*,[111] this Court can only conclude that AVStar's use of the RSA marks is not classic fair use.

## I.    AVCO's Liability

Under trademark law, one who "intentionally induces another to infringe a trademark . . . is contributorily responsible for any harm done as a result of the" infringement.[112] As noted above, it is undisputed that AVStar's use of the RSA marks was done at AVCO's direct and request.[113] Therefore, AVCO will share AVStar's liability for any damages incurred by TNB and Precision NC as a result of AVStar's infringing use of the RSA marks.

## J.    Fraud

To prevail on a fraud claim, a plaintiff must show, by "clear and convincing evidence," that a defendant "knowingly made a false, material representation with

---

[111] *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123 (2004) ("It suffices to realize that our holding that fair use can occur along with some degree of confusion does not foreclose the relevance of the extent of any likely consumer confusion in assessing whether a defendant's use is objectively fair.").

[112] *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 (1982); *see also American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1432-34 (3d Cir. 1994).

[113] *See supra* note 19. In opposition, AVCO notes that Superior Air Parts had *also* requested that AVStar use the RSA marks when AVStar began reverse-engineering the servos in 2004 or 2005. *See* Ex. 36A to AVCO's Motion for Summary Judgment (Deposition of Ronald Weaver) at 372. While this may possibly have been a basis for implicating Superior, had that plan come to fruition, it does nothing to lessen the liability of AVCO here, since AVCO mandated use of the RSA marks as part of its agreement with AVStar.

the intent to deceive" when applying for registration with the USPTO.[114]   In support, AVCO points to the fact that, when applying to register the RSA mark, Precision WA (1) stated that "RSA appearing in the mark has no significance nor is it a term of art in the relevant trade or industry or as applied to the goods/services listed in the application, or any geographical significance"; and (2) stated that RSA "does not have a meaning" and is a "fanciful" term.[115]   Even if these statements are untrue—*e.g.*, if Mr. Rivera's previously-discussed explanation of the meaning of "RSA" is to be believed—AVCO has failed to point to *any* evidence from which this Court can infer Precision WA's intent to deceive the USPTO, let alone any evidence that would sustain AVCO's burden to prove such intent by clear and convincing evidence.   Therefore, summary judgment will be entered in favor of TNB and Precision NC on this issue.

### III.   CONCLUSION

For the reasons discussed above, TNB and Precision NC have established, as a matter of law, that the RSA marks are not generic and that the marks, though descriptive, have acquired secondary meaning—in other words, they have established that the marks are valid and legally protectable.   TNB and Precision NC have also established, as a matter of law, their ownership of the marks and that

---

[114] *Covertech Fabricating, Inc. v. TVM Building Products, Inc.*, 855 F.3d 163, 174-75 (3d Cir. 2017).

[115] Ex. 61 to AVCO's Motion for Summary Judgment (Response to Office Action dated February 14, 2013).

AVStar's use of the marks is likely to cause consumer confusion. Because TNB and Precision NC, have also established, as a matter of law, that AVStar's use of the marks cannot be considered fair use, they have therefore prevailed on their claim of trademark infringement against AVStar and AVCO. Consequently, summary judgment on the issue of liability will be entered in favor of TNB and Precision NC on all three of their Answer's counterclaims and on Count I of AVCO's Complaint.

Conversely, AVCO has failed to produce enough evidence to sustain its claim of trademark registration fraud against TNB and Precision NC. Therefore, summary judgment will be entered against it on Count II of its Complaint.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge