## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AVCO CORPORATION, | No. 4:12-CV-01313 |
| Plaintiff-Counterclaim Defendant, | (Judge Brann) |
| v. | |
| TURN AND BANK HOLDINGS, LLC, AND PRECISION AIRMOTIVE, LLC, | |
| Defendants-Counterclaim Plaintiffs, | |
| v. | |
| AVSTAR FUEL SYSTEMS, INC. | |
| Counterclaim Defendant. | |

## MEMORANDUM OPINION

### JUNE 22, 2020

## I.  BACKGROUND

In 2015, Avco Corp. ("Avco") filed a second amended complaint in which it sought declaratory judgment holding that AVStar Fuel Systems, Inc. ("AVStar") and Avco had not infringed on Turn and Bank Holdings, Inc.'s ("TNB") trademarks, and seeking cancellation of several of TNB's trademarks related to airplane engine fuel injection systems known as "servos."[1]  TNB in turn filed a counterclaim asserting

---

[1]  Doc. 138.

that AVStar and Avco were liable for trademark infringement and unfair competition under the Lanham Act and Pennsylvania common law related to AVStar's use of TNB's "RSA" Marks, which are used on servos produced by Precision Airmotive Corporation ("Precision").[2]

Much of the relevant history and facts related to the underlying dispute—such as the history of the companies and details regarding aircraft engines, servos, and naming conventions—was outlined in some detail in this Court's prior summary judgment Memorandum and, because it is not directly relevant to the pending motions, will not be repeated here.[3] As relevant here, Precision has long produced servos bearing RSA Marks and, when AVStar and Avco reached an agreement on the purchase of AVStar servos, Avco required that AVStar use the same RSA Marks as are used by Precision.[4]

Based on the facts underlying this matter, in April 2018, this Court granted TNB's motion for summary judgment and denied Avco's motion for summary judgment.[5] The Court concluded that TNB had established as a matter of law that the RSA Marks are valid and legally protectable, and that AVStar's use of the marks was likely to cause consumer confusion.[6] The Court therefore entered judgment on

---

[2] Doc. 144. Although there are several iterations of Precision, for the sake of simplicity, the Court refers them as a single entity in this Memorandum.

[3] *See* Doc. 356 at 2-10.

[4] *Id.* at 3, 5.

[5] Docs. 356, 357.

[6] Doc. 356.

the issue of liability as to all counterclaims, leaving for trial only the issue of damages against AVStar and Avco.[7]  In December 2019, the parties filed dueling motions to exclude expert testimony: TNB seeks to exclude the testimony of Avco's expert, Krista Holt, while Avco[8] seeks to exclude the testimony of TNB's expert, Dana Trexler.[9]  Additionally, TNB has filed a motion to "exclude evidence or argument on liability and matters already decided by the Court,"[10] while Avco has filed a motion to strike one of TNB's reply briefs.[11]

In February 2020, the Court held a hearing on the pending motions to exclude, where it heard testimony from Holt and Trexler.  The Court thereafter provided the parties with an opportunity to file supplemental briefs, which they have done.[12]  Having reviewed the briefs, expert reports, and testimony, it is apparent that the dispute between the experts and parties boils down to a simple question: would Avco have purchased AVStar servos absent AVStar's use of the RSA Marks?  Although the Court views one expert opinion as markedly better than the other, both experts offer reasoned bases for their opposing conclusions that Avco either would or would not have made such purchases.  As explained below, resolution of this question will

---

[7]  *Id.*

[8]  For purposes of the motions to exclude, except as necessary to distinguish between the entities, AVStar and Avco are referred to collectively as only Avco, while TNB and Precision are referred to as only TNB.

[9]  Docs. 430, 432.

[10]  Doc. 428.

[11]  Doc. 458.

[12]  Docs. 452, 453, 455.

likely turn upon factual determinations that may only be resolved at trial.  Because the reliability of the expert opinions is either well established, or must be examined more carefully upon receipt of evidence at trial, the motions to exclude will largely be denied.  Furthermore, TNB's motion to exclude certain evidence or argument will be denied, and Avco's motion to strike will be denied, although Avco's sur-reply brief will be accepted.

## II.    DISCUSSION

Federal Rules of Evidence 702 and 703 govern the admissibility of expert testimony and set forth certain criteria for admissibility.  Expanding upon those Rules, the United States Supreme Court set forth the standard for admissibility of expert testimony in *Daubert v. Merrell Dow Pharm., Inc.*[13]  The Court in *Daubert* delegated to district courts a "gatekeeping responsibility" under Rule 702, which requires that courts determine at the outset whether an expert witness may "testify to (1) scientific knowledge that (2) will assist the trier of fact."[14]  That gate-keeping function demands an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" as well as "whether that reasoning or methodology properly can be applied to the facts in issue."[15]  A district court "exercises more control over experts than over lay witnesses," since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in

---

[13]   509 U.S. 579 (1993).

[14]   *Id.* at 592.

[15]   *Id.* at 592-93.

evaluating it."[16]

Following *Daubert*, the United States Court of Appeals for the Third Circuit cast expert admissibility determinations in light of three basic requirements: (1) qualification; (2) reliability; and (3) fit.[17] The qualification prong demands that the proffered expert possess sufficient "specialized knowledge" to testify as an expert.[18]  To satisfy the reliability prong, an expert's opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[19]  The Third Circuit has set forth eight non-exclusive factors that "a district court should take into account" when deciding the reliability of expert testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[20]

With regard to the fit prong, the Third Circuit explained that admissibility "depends . . . on the proffered connection between the scientific research or test result . . . and [the] particular disputed factual issues."[21]

---

[16]   *Id.* at 595 (internal quotation marks omitted).
[17]   *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994).
[18]   *Id.* at 741.
[19]   *Id.* at 742 (*quoting Daubert*, 509 U.S. at 589).
[20]   *Id.* at 742 n.8.
[21]   *Id.* at 743 (internal quotation marks omitted).

The burden of proof for admissibility of expert testimony falls upon the party that seeks to introduce the evidence. [22]   However, as the Third Circuit has emphasized, "[t]he test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct.  Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology."[23]

> This standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.[24]

District courts must always be cognizant of the fact that "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination."[25]

### A.    TNB's Motion to Exclude

TNB argues that Krista Holt's testimony should be excluded on two grounds. First, TNB asserts that Holt should be precluded from testifying that profits from AVStar's sales to Avco and Avco's sales of engines which incorporated AVStar servos should be excluded from any disgorged profits analysis, as this matter was

---

[22]  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000)
[23]  *Id.* (internal quotation marks omitted).
[24]  *Id.* (internal quotation marks omitted).
[25]  *Id.* (internal quotation marks omitted).

decided at summary judgment.[26]  Second, TNB contends that Holt is not sufficiently qualified to testify regarding naming conventions for pressure carburetors and/or fuel injection servos.[27]  TNB argues that Holt's testimony in that respect could only serve as an attempt to refute the validity of the RSA Marks, which this Court has already established as a matter of law.[28]  Furthermore, Holt's statements are based on unauthenticated hearsay and made in an area in which Holt possesses no expertise.[29]

Finally, in its supplemental memorandum, TNB asks that certain of Holt's opinions and theories expressed at the *Daubert* hearing be excluded.[30]  TNB asserts that several of these opinions were first expressed after the relevant deadlines passed, including: (1) calculations based on AVStar's sale of servos after it ceased using RSA Marks, including models bearing LFC and LFR Marks;[31] (2) any valuation of the RSA Marks based upon a 2013 Sales Agreement between TNB and Precision;[32] and (3) any opinion based upon Holt's knowledge or expertise in marketing.[33]  TNB also argues that, because these opinions were not timely disclosed, it is entitled to reimbursement of reasonable fees expended in addressing this matter.[34]

---

[26]  Doc. 431 at 7-13.
[27]  *Id.* at 13-15.
[28]  *Id.* at 14.
[29]  *Id.* at 14-15.
[30]  Doc. 453.
[31]  *Id.* at 8-15.
[32]  *Id.* at 15-17.
[33]  *Id.* at 17-20.
[34]  *Id.* at 21-22.

### i.    Opinion Regarding Naming Conventions

Turning first to TNB's assertion that Holt should be barred from offering expert testimony as to carburetor or servo naming conventions, during the *Daubert* hearing Holt made clear that she in fact is not offering any such expert opinion, but instead included information on naming conventions in her expert reports for background purposes only.[35]  Because Holt does not intend to offer an expert opinion regarding carburetor or servo naming conventions, TNB's motion to exclude said opinion will be denied as unnecessary.

### ii.    Use of LFC and LFR Data

Next, TNB asserts that Holt should not be permitted to offer any opinion or testimony that relies upon AVStar sales figures dated after 2018 when AVStar switched from the RSA Marks to LFC and LFR Marks.[36]  TNB asserts that Avco agreed it would not raise any new damages theories or rely upon LFC sales numbers in proffering expert opinions.[37]  Nevertheless, TNB argues, Holt for the first time during the *Daubert* hearing asserted that stable or rising sales figures after AVStar ceased using the RSA Marks means that the RSA Marks held no significant value.[38]  Avco in turn asserts that Holt has not changed her opinion but, rather, is supporting her opinion with new evidence that was not previously available, which is

---

[35]  Doc. 451 at 186.
[36]  Doc. 453 at 8-15.
[37]  *Id.*
[38]  *Id.*

permissible, particularly since Precision demanded the updated financial information.[39]  Regardless, Avco argues, exclusion is not justified.[40]

First, TNB asserts that Avco agreed it would not raise any new damages theories or rely upon LFC sales numbers in proffering expert opinions, as the parties stipulated in a letter to the Court that they would submit "expert reports that include updated financial numbers (not including sales of LFC units)."[41]  Avco contends that TNB is twisting the intent of that language, which "was included with the intent to clarify that Ms. Trexler would not include additional damages based on the sales of LFC servos Precision claimed to still be infringing because that would be double-dipping in light of the then pending North Carolina action."[42]

As to Precision's contention that Avco agreed not to supplement Holt's opinion based upon the LFC/LFR data, given the clearly differing views on the meaning of the somewhat ambiguous language contained in the letter, and the lack of clear evidence supporting either interpretation, the Court will not exclude said data based on the letter.

Second, contrary to TNB's assertion, it is clear that use of the LFC/LFR Data does not constitute a new opinion from Holt.  Holt's 2017 opinion did not incorporate LFC/LFR data because AVStar did not begin to use LFC and LFR Marks on its

---

[39]  Doc. 455 at 7-14.
[40]  *Id.* at 12-14.
[41]  *Id.*; Doc. 426.
[42]  Doc. 455 at 6 n.3.

servos until July 2018 and October 2019, respectively.[43]  That data shows that sales of AVStar servos remained consistent or slightly increased after AVStar ceased using the RSA Marks on its servos.[44]

While Holt's 2017 report did not include LFC/LFR data, Holt nevertheless opined that Avco purchased servos based on a number of factors, including "price, quality, and speed of service"[45] and that purchasing decisions were not driven by the RSA Marks.[46]  Similarly, in her November 2019 update, Holt again opined "that Avco purchased factory new servos from AVStar for a number of reasons: price, quality, on-time delivery, and the benefit of having a second servo supplier" and not because of the RSA Marks that those servos bore.[47]  Holt further noted that recent data from the sales of AVStar servos bearing LFC Marks supported her opinion: "my analysis of AVStar sales indicates that after AVStar stopped making its servos with the RSA marks, its servo sales rose which appears inconsistent with a theory that servo purchases are driven by the markings that they bear."[48]

At the *Daubert* hearing, Holt reiterated her view that servo purchases were driven by factors other than the RSA Marks, as demonstrated by stable or increased servo sales after AVStar began using LFC and LFR Marks on its servos.[49]  As Holt

---

[43]  Doc. 435-7 at 2 n.3; Doc. 451 at 146.
[44]  *See Daubert* Hearing Ex. CD-3.
[45]  Doc. 435-2 at 17.
[46]  *Id.* at 17-18.
[47]  Doc. 436-1 at 1 n.1.
[48]  *Id.* at 16 n.1.  *See also* Doc. 435-7 (comparing AVStar sales of RSA and LFC servos).
[49]  Doc. 451 at 142-48, 154-62.

explained, "there is no part of the purchase decision that is based on the model number.  And in fact, that was played out when they did change the model number and the profits stayed the same.  So we know that it's zero percent because the profits stayed the same."[50]

This demonstrates that Holt's use of the LFC/LFR data does not constitute a new opinion but, rather, is simply a reiteration of her prior opinion utilizing new data not available at the time that she drafted her original expert report.   In such circumstances, courts have repeatedly expressed that an opinion "need not be stricken if it is merely 'an elaboration of and consistent with an opinion/issue previously addressed' in the expert report."[51]   Consistent with this general rule, courts will permit an expert to supplement her report when she "receives newly produced information after submitting . . . her expert report."[52]  Because Holt's use of the LFC/LFR Data—data that was not available at the time she issued her initial report—is consistent with, and a mere elaboration of, her prior opinion, Holt will not be precluded from relying on that data in formulating her expert opinion.

Third, even assuming that use of the LFC/LFR Data constitutes a new opinion, the Court concludes that exclusion would not be warranted.  This Court must

---

[50]  *Id.* at 162.

[51]  *N.J. Dep't of Envtl. Prot. v. Amerada Hess Corp.*, No. CV156468FLWLHG, 2019 WL 4052431, at *4 (D.N.J. Aug. 28, 2019) (quoting *Pritchard v. Dow Agro Scis.*, 263 F.R.D. 277, 284-85 (W.D. Pa. 2009)).

[52]  *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, No. CV155477MCALDW, 2019 WL 581544, at *3 (D.N.J. Feb. 13, 2019) (collecting cases).

evaluate any attempt to exclude an expert opinion or evidence under the "*Pennypack* factors" and consider:

> (1) "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified" or the excluded evidence would have been offered; (2) "the ability of that party to cure the prejudice"; (3) the extent to which allowing such witnesses or evidence would "disrupt the orderly and efficient trial of the case or of other cases in the court"; (4) any "bad faith or willfulness in failing to comply with the court's order"; and (5) the importance of the excluded evidence.[53]

As to prejudice or surprise, there is little present.  As discussed previously, the new LFC/LFR Data merely reinforces Holt's earlier opinion that AVStar's sales to Avco were driven by factors other than the RSA Marks; that Holt would supplement her opinion with pertinent data could not have surprised TNB, particularly where that data was supplied to TNB.  Holt previously noted that she relied on the *Litigation Services Handbook*—a tool commonly used by experts—which notes that, if possible, experts should consider "the infringer's sales and profits before and after the alleged wrongful act."[54]  Critically, TNB's own expert also considered the LFC sales data in formulating her expert opinion.[55]  Given that TNB was aware of the sales data, aware that such data was relevant to any damages analysis, and that the data was relied upon by its own expert, it is difficult to conceive of any surprise or prejudice resulting from Holt's reliance upon that data, and the

---

[53]  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904-05 (3d Cir. 1977)).

[54]  Doc. 451 at 154-55; *see* 456-3 at 4.

[55]  Doc. 451 at 112-13.

first factor weighs in favor of permitting Holt to consider the LFC/LFR Data. Because there is little or no prejudice, the second factor likewise militates in favor of admitting the data, as there is no prejudice for Avco to cure.

With regard to the third factor, permitting reliance on the LFC/LFR Data would not disrupt the orderly and efficient trial of this case.  Trial has not yet been set in this matter and, given that all parties are aware of the LFC/LFR Data, and their experts have considered that data, it is highly unlikely that admission of the data would disrupt or impede trial in any manner.  Fourth, the Court perceives no bad faith or willfulness in Holt's actions.  The LFC/LFR Data was not available when Holt submitted her initial expert report, and the data did not come into existence until 2018 and later.  Holt's opinion was updated when possible and, thus, does not appear to have been updated in bad faith.

Finally, the LFC/LFR Data is of significant importance.  As Holt discussed in her *Daubert* testimony, comparing sales of infringing products with sales after the infringing marks are removed is the only information that speaks directly to the "effect of a mark" and that directly answers the question "[d]o those decision makers make different decisions when the mark is changed, or do they make the same decisions and buy the same amount of sales at the same profits."[56]  This data is highly relevant, and TNB's motion raises a fundamental question for the Court: should it

---

[56]   Doc. 451 at 155-56.

be deprived of perhaps the most pertinent data available regarding apportionment of profits—AVStar's sales figures after it ceased using the RSA Marks—simply because that data was not available earlier in these proceedings?  All five *Pennypack* factors indicated that the answer here must be no, and TNB's motion to exclude the LFC/LFR Data or any opinion based on that data will be denied.

### iii.    Opinion Related to 2013 Sales Agreement

TNB next argues that the Court should exclude any valuation opinion from Holt based upon the 2013 Sales Agreement between TNB and Precision, as Holt did not offer said opinion prior to the *Daubert* hearing.[57]  Avco responds that Holt was offering a possible value for Precision, not the RSA Marks, and that her opinion related to the 2013 Sales Agreement is not new, but was instead discussed during Holt's initial report and deposition and is only being offered to refute Precision's criticism of her opinion.[58]

Based on Holt's testimony at the *Daubert* hearing, it does appear that she is offering a new method—never before proffered—for valuing Precision and the RSA Marks.  Holt testified at the hearing that trademarks are valued by "look[ing] at the marketplace.  Has this ever been bought or sold.  What was the price . . . we know that when Precision was purchased, a transaction happened. And it was [$]600,000

---

[57]    Doc. 453 at 15-17.
[58]    Doc. 455 at 15-16.

for the entire company, including the trademark. . . . that's a market transaction that you could refer to . . . [b]ecause that happened in the marketplace."[59]

Holt followed up that testimony by asserting that "Precision, the entire company, every single thing they have, every piece of equipment, every manufacturing—every single thing they had was valued at [$]600,000," including its trademarks.[60]  Holt elaborated that "[w]ithin that [$600,000] somewhere would be the fact that you were using a modeling number . . . [s]o . . . after you take out the equipment, . . . and after you take out the facility, you take out everything, you would be left with the [value of the] trademark."[61]

This testimony clearly indicates that Holt was offering an opinion as to the value of Precision and, more specifically, its trademarks and the RSA Marks—an opinion that was not offered at any earlier time.  The Court must therefore analyze the *Pennypack* factors to determine whether such opinion should be excluded.

First, turning to TNB's prejudice or surprise, the surprise is great, as Holt never before connected TNB's purchase of Precision with a valuation of the RSA Marks or with any damage calculation from AVStar's misappropriation of the RSA Marks.  This would also lead to some prejudice—to fully understand and respond to Holt's new theory, TNB would likely need to expend further resources by deposing Holt and/or obtaining a rebuttal opinion from Trexler.

---

[59]   Doc. 451 at 206-07.
[60]   *Id.* at 210.
[61]   *Id.* at 211.

As to the second and third factors, Avco does have some ability to cure any prejudice by submitting Holt to an additional deposition and by paying some or all of TNB's associated costs.  Although trial has not yet been scheduled, permitting this new opinion would engender some delay.  Upon disposition of the pending motions, this matter is likely be ready to be scheduled for a date certain trial.  However, such a trial would almost certainly be delayed should an additional deposition need to be scheduled and a rebuttal opinion prepared.

With respect to the fourth *Pennypack* factor, the Court cannot conclude that Holt's opinion was untimely offered either willfully or in bad faith.  Rather, as Avco notes, Holt appears to have offered the opinion in response to defense counsel's criticism of her apportionment methodology and—as defense counsel viewed it— "her testimony about apparent lack of value of the trademarks."[62]

Finally, as to the fifth and "most significant factor,"[63] the importance of the excluded evidence, the Court finds that evidence related to the 2013 Sales Agreement is of little importance.  Any valuation of Precision as a whole, or its trademarks, it entirely irrelevant to the issue before the Court—the damages to which TNB is entitled based upon AVStar/Avco's infringement of TNB's trademarks.[64] The Court has been unable to locate a single court case or opinion that links the

---

[62] Doc. 451 at 206.
[63] *ZF Meritor*, 696 F.3d at 298.
[64] *See* 15 U.S.C. § 1117 (noting that monetary award for trademark infringement is based upon actual damages or lost profits).

16

perceived value of a trademark by its owner to the damages that result from a misappropriation of that mark, and Holt's testimony did not provide any basis to find such a nexus.

Accordingly, after weighing the five *Pennypack* factors, the Court concludes that TNB's motion to exclude Holt's opinion with respect to the 2013 Sales Agreement will be conditionally granted.  However, Avco has the option of pursuing this theory should it wish to pay TNB's costs and expenses associated with preparing a rebuttal to the theory.

### iv.   Expert Marketing Opinion

TNB next contends that Holt should be precluded from offering any opinion as a marketing expert, as she never before asserted that she would offer an expert opinion in marketing, she has no direct experience in the field as it relates to the aviation industry and only consulted with Avco itself in an attempt to gain insight into the driving factors for aviation purchases.[65]  In response, Avco argues that Holt offers no new marketing opinion; rather, Holt simply used her marketing background—which she relayed in her initial report—to assist her in determining what drove market purchasing decisions as part of her apportionment analysis.[66]  To the extent that TNB challenges Holt's reliance on testimony from Avco employees, Avco asserts that experts may rely on such testimony.[67]

---

[65]   Doc. 453 at 17-20.
[66]   Doc. 455 at 15-18.
[67]   *Id.* at 17.

17

During the *Daubert* hearing, Holt testified that "of course" she was offering an opinion as a marketing expert.[68]  As Holt explained, however, "[w]hat we are often looking at in intellectual property as a marketing expert is we are looking at what drives the purchase decision," which is critical to an apportionment analysis.[69] She further emphasized that "[f]or intellectual property cases, because we look at what drives the purchase decision, it is often marketing kinds of opinions that are going to get to bottom of that."[70]

Thus, although Holt's testimony facially supports the notion that she is attempting to offer an independent expert marketing opinion, a deeper reading of her testimony demonstrates that Holt's marketing experience merely informs her expert opinion as to damage calculations.  The basis of that opinion—that apportionment should be based upon what drives purchasing decisions, and only purchases influenced by the RSA Marks should be disgorged from AVStar/Avco's profits— has been a part of Holt's expert opinion since the beginning.[71]  Although the Court recognizes that this is a fine line, Holt may rely on her experience with marketing, but only to the extent that such experience informed her understanding of what

---

[68]   Doc. 451 at 187.
[69]   *Id.*; *see id.* at 187-94.
[70]   *Id.* at 190.
[71]   *E.g.*, Doc. 435-2 at 17-18 (Holt's February 2017 rebuttal report explaining that damages must account for sales that are not attributable to RSA Marks but, instead, were driven by other factors).

factors drive purchasing decisions for servos and, thus, how to apportion AVStar and Avco's profits.

To the extent that Holt seeks to offer naked expert marketing testimony, for largely the same reasons discussed above with respect to Holt's testimony related to the 2013 Sales Agreement, she will be precluded from so doing.  Holt never before indicated that she would offer expert marketing opinions, and TNB would be unable to prepare a rebuttal without expending significant time and resources, which would inevitably delay trial.  Although it is difficult to ascertain whether there is any bad faith or willfulness in any belated disclosure of an expert marketing opinion—if indeed Holt seeks to offer such an opinion—the importance of an independent marketing expert opinion, separate and apart from an understanding of what drives purchasing decisions, would seem negligible.  Consequently, Holt may not offer an independent expert marketing opinion.

**v.      Whether Holt's Expert Opinion Should be Excluded**

Finally, turning to the merits of TNB's assertion that Holt's expert opinion should be excluded, TNB argues that Holt should be precluded from testifying that profits from AVStar's sales to Avco, and Avco's sales of engines that incorporate AVStar servos, should be excluded from any disgorged profits analysis.[72]

---

[72]   Doc. 431 at 11-17.

TNB asserts that Holt improperly opines that Avco/AVStar customers would likely not be confused as to the manufacturer of their servo, as this ignores the Court's conclusion that confusion is established as a matter of law.[73]  Relatedly, according to TNB, Holt's conclusion that Avco ascribed no value to the RSA Marks is irreconcilable with the Court's conclusion that Avco mandated that AVStar use the RSA Marks.[74]  Lastly, TNB argues that Holt engaged in no investigation or analysis into whether the RSA Marks have value or contribute to consumer perceptions of AVStar's products and, in her initial report, Holt conceded that all profits should be disgorged where confusion is found.[75]

Avco responds that the evidence confirms that Avco knew it was purchasing servos from AVStar, not Precision, and that Avco made a deliberate decision to purchase from AVStar and, thus, there is no possibility that Avco was confused when purchasing servos from AVStar.[76]  Avco similarly argues that Avco's customers would not have been confused, as customers purchase Avco engines based on the brand of engine, rather than the brand of servo, which is not viewable in a completed engine.[77]  Avco further argues that Holt did not change the basis of her opinion—her report that predated the summary judgment decision makes clear that the Avco's decision to purchase servos was based on factors other than

---

[73]  *Id.* at 11-13.
[74]  *Id.* at 13-14.
[75]  Doc. 431 at 15-17.
[76]  Doc. 438 at 7-8.
[77]  *Id.* at 8-9.

confusion.[78]  Finally, Avco notes that simply because Avco directed AVStar to use the RSA Marks does not mean that purchasing decisions were based upon use of the RSA Marks.[79]

Holt adequately described the basis of her opinion at the *Daubert* hearing, and her opinion does not explicitly rely on a lack of confusion but, rather, is based upon her determination of what factors drove the sales of AVStar servos.  Holt explained that she developed her opinion after she and her team spent more than 1,300 hours researching the aviation industry and products, analyzing sales patterns, reviewing depositions and sales data, and interviewing Avco and AVStar employees.[80]  After conducting that review, Holt determined that, in her opinion, no sales of servos from AVStar to Avco would have gone to Precision absent the RSA Mark infringement.[81]  Rather, the sales from AVStar to Avco were driven by factors such as price, quality, dependability, on-time delivery, and the relationship with the supplier, none of which would have changed had AVStar servos not used the RSA Marks.[82]

---

[78]  *Id.* at 10-12.

[79]  *Id.* at 14-15.

[80]  Doc. 451 at 132.  This research undermines TNB's contention that Holt "undertook no investigation or analysis" to determine what drove the purchasing decisions of AVStar's customers.  (Doc. 431 at 15-17).

[81]  Doc. 451 at 134-35, 138-41.

[82]  *Id.* at 156-62.  TNB also asserts that Holt's opinion should be excluded because she relies on the "self-interested" testimony of Avco employees to conclude that purchases were based on factors other than the RSA Marks.  (Doc. 453 at 19).  The fact that Avco employees may have some motive to testify falsely is a credibility issue that may be explored at trial, but is no reason to discount Holt's expert opinion at this stage of the proceedings.  Similarly, TNB argues that the evidence demonstrates that Avco sought to supplant Precision with AVStar as a servo supplier and did not merely intend to use a second servo supplier, as Holt opines.  (Doc. 431 at 14-15).  Again, this is a factual matter that should be resolved at trial.

Holt observed that AVStar sales records support this conclusion: after AVStar switched to LFC and LFR Marks on their servos, servo sales stayed consistent or increased, demonstrating that sales were due to factors other than the RSA Marks.[83] Holt elaborated that "[w]hen I looked at their sales and profits with the change from one supplier to two, I didn't see a price change. I didn't see any difference. So that told me they were telling me the truth" about why Avco was purchasing servos from AVStar.[84]

Moreover, although there may have been some instances where AVStar's use of the RSA Marks confused some individuals as to who manufactured the servos, as Holt emphasized, in any damages analysis "it's the purchase decision maker that we're interested in, not an employee or anyone else at Avco."[85]  Essentially, the only relevant question in Holt's view is whether "those decision makers make different decisions when the mark is changed, or do they make the same decisions and buy the same amount of sales at the same profits."[86]  Thus, Holt did consider evidence of actual confusion, but found it irrelevant to her damages analysis, since none of that evidence implicated the decisionmakers who were making purchasing decisions for Avco.

---

[83]   Doc. 451 at 142-48; *see also Daubert* Hearing Ex. CD-3; Doc. 435-7.
[84]   Doc. 451 at 175.
[85]   *Id.* at 173.
[86]   *Id.* at 156.

Similarly, as to sales from Avco to third parties, Holt opined that anywhere from zero to thirteen percent of Avco's profits should be disgorged.[87]  Holt opined that none of Avco's sales were driven by the servo that was placed in the engine, and testified "we have to keep in mind, certain airplanes have to have certain engines. And the airplanes that have to have the Lycoming engine cannot substitute another engine. They are designed for the Lycoming engine, and they have to have that engine.  So they don't care what supplier Lycoming or Avco uses . . . [f]or the servo or any other part."[88]

Holt testified that her opinion was supported by Avco's sales figures:

So we know even before the model number was changed . . . that there would not be profit that we would be able to say is driving that purchase decision, that the model number is driving that purchase decision, because we already knew when they went from one supplier to two and the marketplace did not reduce the quantity they bought from them. Why didn't they reduce it? And it's because they want a Lycoming engine. Why do they want a Lycoming engine? Certain airplanes have to have that particular engine.[89]

Thus, in Holt's opinion, Avco's customers purchase Avco engines for the same reasons that Avco purchases AVStar servos: "the quality, the timely delivery . . . that it will come at a good price, that the quality will be good, . . . that the airplane manufacturer will not shut down its facility because the engine manufacturer can't get them engines on time."[90]

---

[87]  *Id.* at 163-70.
[88]  *Id.* at 165.
[89]  *Id.* at 164.
[90]  *Id.*

23

The totality of Holt's testimony makes clear that, contrary to TNB's assertion, Holt's opinion is not explicitly based on an absence of confusion.  While Holt's opinion may initially appear to be based on the absence of confusion, the absence of confusion and the decision to buy servos based on factors other than the RSA Marks are simply "two sides of one coin."[91]   As Holt explained, "[y]ou either bought because of price, quality, on-time delivery and the relationship . . . [o]r . . . you were making the purchase decision because of the confusion."[92]   Holt's opinion is based upon considerations other than confusion or a lack thereof, and TNB's efforts to exclude her testimony on that ground will be denied.

Finally, the fact that AVStar was contractually obligated to use the RSA Marks in its servos does not undermine Holt's opinion.  Although the fact that Avco required the use of RSA Marks may indicate that Avco ascribed some value to those marks, Holt opined that "when Avco requested that AVStar use the mark, it was in with all the other requests they had then.  They requested certain specifications.  They requested they use the mark.  It's like a preference, if you think of it that way."[93]   Thus, in Holt's view, Avco preferred the RSA Marks, but did not need them and, when Avco realized "that [using the RSA Marks] was a problem, they immediately changed . . . if it were a need, things would [not] have . . . changed.  We

---

[91]   Doc. 451 at 175.
[92]   *Id.*
[93]   *Id.* at 238.

would have seen a very different outcome."[94]   Holt further elaborated that any

contractual agreement is irrelevant to a damages analysis: "for damages, what that

means is that we have to look economically.  And economically trademarks are made

in the marketplace, not in some agreement that the marketplace doesn't even know

about."[95]   The Court concludes that Holt has adequately explained her opinion with

respect to Avco requiring AVStar to use RSA Marks; whether Holt's opinion is

correct is a matter left for resolution at trial, not in a motion to exclude.[96]

### vi.     Request for Reimbursement of Expenses

TNB also requests reimbursement of its expenses in opposing Holt's allegedly

untimely proffered opinions, pursuant to Rules 26(a) and 37(c) of the Federal Rules

of Civil Procedure.[97]   Where a party fails to timely disclose expert opinions, courts

"may order payment of the reasonable expenses, including attorney's fees, caused

by the failure."[98]

---

[94]   *Id.*

[95]   *Id.* at 203.

[96]   TNB also argues that Holt's opinion is "inconsistent with the undisputed fact that AVStar, at AVCO's direction and with its indemnification of AVStar, maintained use of the RSA Marks for approximately nine years before transitioning after the summary judgement order, all the while incurring significant legal fees." (Doc. 431 at 16).  TNB apparently believes that Avco would not have expended significant time and money litigating this matter if the RSA Marks did not hold value to Avco.  This, however, does not undermine Holt's opinion.  Not only do these facts go to the weight—rather than admissibility—of Holt's opinion, but Holt provided an alternative explanation for why Avco may have persisted in use of the RSA Marks.  (Doc. 451 at 207).  Ultimately, whether TNB or Holt is correct is an issue reserved for trial.

[97]   Doc. 453 at 21-22.

[98]   Fed. R. Civ. P. 37(c)(1)(A).

The Court finds that such sanctions are not warranted here. First, the majority of TNB's motion to exclude will be denied, as Holt's reliance on the LFC/LFR Data did not constitute a new opinion, nor did Holt's use of her prior marketing experience.[99] Second, although this Court will exclude testimony related to Holt's valuation of Precision or the RSA Marks based upon the 2013 Sales Agreement, Holt's opinion in that respect does not appear to have been offered in bad faith, and it does not appear that Holt was withholding her opinion in the hopes of surprising TNB. Rather, it seems to the Court that Holt was making "off-the-cuff" assertions in response to counsel for TNB questioning whether Holt "attribute[d] no value to the trademarks that have been found to be already valid in this case."[100] Such remarks are not, in the Court's view, sanctionable beyond the exclusion of the underlying opinion.

## B.   Avco's Motion to Exclude

Avco seeks to exclude Dana Trexler's testimony on three primary grounds: (1) Trexler's opinion as it relates to the recovery of lost profits is untimely and otherwise contrary to the evidence of record; (2) her testimony is speculative; and (3) her rebuttal opinion to Holt's expert report is untimely and should therefore be excluded.[101]

---

[99] The Court did, of course, grant TNB's motion to the extent that Holt sought to offer independent expert marketing testimony, but the Court does not believe that Holt actually seeks to offer an independent expert marketing opinion.

[100] Doc. 451 at 208. *See id.* at 208-12.

[101] Doc. 433.

### i.       Timeliness of Trexler's Opinions

As to Avco's first and third argument, Avco contends that TNB originally made clear that they sought only disgorgements of profits and would not seek damages for their lost profits, only to change their position long after discovery closed and summary judgment was granted—in violation of the requirements of Fed. R. Civ. P. 26(a) and 37(c).[102]  Moreover, Avco argues that Trexler's rebuttal analysis does more than simply rebut Holt's October 2019 financial updates.[103]  Rather, Avco asserts that the "additional critiques" section includes new rebuttals to Holt's original 2017 opinion, and is therefore untimely, as rebuttals were due in July 2017.[104]

In response, TNB asserts that Trexler never changed her analysis to include a lost profits analysis—to the contrary, she discussed lost profits in detail in her original expert reports and at her deposition.[105]  Accordingly, TNB contends that not only was Trexler's opinion timely, but Avco suffered no prejudice, as it was able to extensively examine Trexler about her opinion during the deposition.[106]

The Court finds that Trexler timely disclosed her lost profits analysis.  In Trexler's January 11, 2017 expert report, she clearly included a detailed analysis for damages utilizing a lost profit calculation and asserted that TNB is legally able to

---

[102]  *Id.* at 7-13.
[103]  *Id.* at 22-24.
[104]  *Id.*
[105]  Doc. 439 at 3-17.
[106]  *Id.* at 3-7.

recover such damages.[107]   Thus, Trexler long ago revealed the methodology and basis for her lost profit calculation, the data supporting it, and her conclusions.

True, Trexler also asserted—somewhat confusingly—that she had "been asked to provide an alternate scenario *for informational purposes* on damages under a lost profits theory . . ."[108]   It is this statement that forms the primary basis for Avco's motion to exclude.   However, as Trexler explained at the *Daubert* hearing, the intended meaning of that statement was that "[i]t's informational purposes for the Court.   Since I know actual damages are a remedy that's available to the counterclaim plaintiffs, and I separated the two analyses in my report."[109]   Trexler elaborated:

> I was trying to cull it out and say there's the disgorgement of profits calculation that I did, and separately I calculated actual damages and then disgorgement on another component. . . . I wanted to separate them because the calculation of lost profits also includes a disgorgement piece.   And so I didn't want it to be confusing.   I wanted it to be very clear in my report that the first calculation I did was solely disgorged profits, and the second is lost profits, plus a disgorgement piece. . . . And by the time we got into my later reports, I think I had made that point enough times that we then moved everything up.[110]

Trexler's explanation satisfactorily addresses the challenged language.   The Court also notes that, as a matter of common sense, it would make little sense for Trexler to include a lengthy explanation in her report regarding a lost profit

---

[107]   Doc. 434-1 at 8-9, 21-27.
[108]   *Id.* at 11 (emphasis added).
[109]   Doc. 451 at 53.
[110]   *Id.* at 115-16.

analysis—which must have entailed a significant amount of time spent compiling data and calculating numbers—if TNB did not contemplate seeking such damages.[111]  TNB's cross-complaint requests actual damages and an accounting of any profits derived from the use of the RSA Marks, buttressing the conclusion that TNB was seeking lost profit damages and, therefore, Holt was offering an actual opinion on said damages.[112]

Even if Holt offered a new damages theory in her October 2019 report, an analysis of the *Pennypack* factors demonstrates that her lost profit opinion should not be excluded.  First, there could not have been a great deal of surprise that Holt and TNB would seek to recover lost profits, as that is both statutorily permissible, and because Holt offered a lost profit calculation in every expert report that she proffered, even if she included language in her reports indicating that said calculation was for informational purposes.  Similarly, there does not appear to be much, if any, prejudice.  Trexler confirmed during her deposition that her reports should be read as indicating that TNB sought damages "in the form of disgorged profits and/or actual damages."[113]  More importantly, during her deposition, Avco

---

[111]  At a fee rate of $460 per hour (Doc. 434-1 at 4), it borders on the absurd to suggest that TNB would ask Trexler to expend any amount of time developing calculations for lost profit damages that TNB did not seek to recover—this would only provide an irrelevant comparison point to the damages that TNB was actually seeking.  The only sensible conclusion is that TNB asked Trexler to calculate lost profit damages because it sought—or was at least contemplating seeking—such damages.

[112]  Doc. 144 at 27-28.

[113]  Doc. 441 at 21.

questioned Trexler regarding her lost profit calculations and Trexler explained why she included the controversial "informational purposes" language.[114]  Second, the absence of any real prejudice weighs in favor of admitting the opinion, as there is no prejudice to cure.

Third, allowing Trexler's lost profit calculations would not disrupt trial, as no trial date has yet been set, and Avco has had ample time to examine and respond to Trexler's opinion.  Fourth, as detailed above, given that lost profit calculations were included in Trexler's first expert report, submitted years ago, and Trexler clarified her opinion in her 2017 deposition, the Court cannot find any bad faith or willfulness in the timing of the submission of her lost profit opinion.  Finally, the lost profit calculations are of significant importance, as the exclusion of those calculations would curtail TNB's ability to pursue statutorily-permitted damages.  Consequently, the Court finds that Trexler's opinion regarding lost profits may be admitted at trial.

Next, Avco argues that Trexler's rebuttal analysis does more than simply rebut Holt's October 2019 financial updates.[115]  Rather, Avco asserts that the "additional critiques" section includes new rebuttals to Holt's original 2017 opinion, and is therefore untimely, as rebuttals were due in July 2017.[116]  TNB responds that Trexler's new rebuttals were required because Holt fundamentally altered her

---

[114] *Id.* at 11-12, 15, 22-23, 26-36.
[115] *Id.* at 27-29.
[116] *Id.*

opinion and, in any event, under the *Pennypack* factors Trexler's rebuttal should be admitted.

Trexler's new rebuttal opinions are untimely, as Trexler raises several critiques of Holt's opinion that were never before offered in this matter.[117] Moreover, contrary to TNB's assertion, as discussed above, Holt's last expert report did not fundamentally alter her opinion and, thus, did not necessitate a new response from Trexler.

Nevertheless, under the *Pennypack* factors, the Court concludes that Trexler's new critiques should not be excluded.  First, regardless of the prejudice or surprise to Avco, Avco had several months between the submission of Trexler's rebuttal on November 1, 2019, and the *Daubert* hearing on February 26, 2020, to prepare to examine Trexler about these opinions, and there was ample opportunity during the *Daubert* hearing to conduct such an examination.  Thus, Avco had sufficient time and opportunity to examine Trexler, which effectively mitigates any prejudice.

Moreover, because Trexler's rebuttal was released well in advance of the *Daubert* hearing, and Avco was able to question her about those opinions during that hearing, any untimely submission of Trexler's rebuttal will engender no delay in these proceedings.  Nor does Trexler's rebuttal opinion smack of bad faith.  Although the Court does not believe that Holt proffered any new opinions that would require

---

[117]  Doc. 436-2 at 7-9.

a new rebuttal from Trexler, the Court recognizes that some changes in Holt's language could have reasonably led Trexler to believe that Holt had altered the basis of her expert opinion.  Finally, there is little importance in the rebuttal opinion, as Holt has not offered a new opinion that needed to be rebutted.  Consequently, although this presents a close question, the weight of the *Pennypack* factors tilts slightly in TNB's favor, and the Court will not exclude Trexler's rebuttal opinion.

### ii.   Whether Trexler's Expert Opinion Should be Excluded

As to the substance of Trexler's opinion, Avco contends that Trexler's opinion regarding lost profits is unreliable for three reasons.[118]  First, according to Avco, the evidence demonstrates that it would have purchased servos from AVStar absent any infringement, rendering unreliable Trexler's assumption that Avco would have continued purchasing solely from Precision absent the infringement.[119]  Second, and relatedly, Avco asserts that it was not confused about the source of its servos, and therefore no lost-sales damages would arise from its purchase of AVStar servos.[120]  Third, Avco notes that sales from AVStar to Avco increased after AVStar ceased using the RSA Marks, indicating that Avco did not purchase the servos based on the RSA Marks.[121]

---

[118]  Doc. 433 at 13-20.
[119]  *Id.* at 16-17.
[120]  *Id.* at 17-19.
[121]  *Id.* at 19-20.

TNB responds that Trexler's opinion is grounded in the undisputed facts and findings of this Court, and is therefore not speculative.[122] Thus, exclusion is not proper, as any issues go to the weight of Trexler's opinion, rather than its admissibility.[123] Specifically, TNB argues that Avco's actions demonstrate that it only wished to purchase RSA-branded servos and, therefore, all profits derived from AVStar's sales of such servos are attributable to the infringement.[124] TNB further argues that actual confusion has been established as a matter of law and there are documented instances of Avco employees being confused about the type of servo used.[125] TNB contends that increased sales of AVStar servos do not undermine Trexler's opinion, as other facts support the value of the trademarks to Avco.[126]

Trexler thoroughly explained the basis for her opinion during the *Daubert* hearing. Trexler testified that her calculation for lost profits is relatively straightforward: because Avco contractually required that AVStar use the RSA Marks, Trexler concluded that Avco required RSA Marks on any servo that it purchased; this effectively created a two-supplier market, as only AVStar and Precision produced servos with RSA Marks.[127] Trexler also opined that Avco and AVStar must have ascribed some value to the RSA Marks because AVStar continued

---

[122] Doc. 439 at 10-15.
[123] *Id.*
[124] *Id.* at 12-14.
[125] *Id.* at 15-16.
[126] *Id.* at 16-17.
[127] Doc. 451 at 39-41, 106-07.

using those marks "for ten years despite this litigation."[128]  Because Avco required

servos with an RSA Mark, and that involved a two-supplier market, Trexler

concluded that 100% of sales from AVStar to Avco were lost profits for Precision

as, absent AVStar's infringement, Avco would have had to order those servos from

Precision.[129]  Trexler therefore took 100% of the profits from the sale of all RSA-

marked servos from AVStar to Avco and subtracted Precision's incremental costs to

arrive at the total lost profits.[130]

Trexler testified that she considered other factors that may have driven Avco's

purchasing decisions, such as price, quality, and on-time delivery, but found none of

those factors significant because "it really comes back to the fact that it's a two-

supplier market."[131]  When only one other supplier is able to supply RSA-marked

servos, Trexler believed that no other factors would contribute to sales.[132]  Trexler

testified that she also considered that sales of AVStar servos increased after AVStar

ceased using the RSA Marks, but found that insignificant as well because Avco and

AVStar "are so intertwined . . . [that] it would be difficult to separate the two."[133]

Trexler's hypothesis, and the evidence supporting it, however, is relatively

weak, as it relies almost entirely on the fact that AVStar was contractually obligated

---

[128] *Id.* at 110.

[129] *Id.* at 40, 105-06.

[130] *Id.* at 42-45.

[131] *Id.* at 41; *see id.* at 40-41.

[132] *Id.*

[133] *Id.* at 41; *see id.* at 112-13.

by Avco to use the RSA Marks and assumes therefore that Avco would only purchase servos with said marks. This conclusion is strongly undermined by two facts. First, although Avco may have required AVStar to use RSA Marks, AVStar nevertheless twice changed its servo markings, demonstrating that any contractual terms may have been more of a suggestion than a requirement. Second, despite those contractual terms, it is clear from the evidence that Avco is willing purchase servos that do not bear RSA Marks. Indeed, sales data confirms that Avco continued to purchase AVStar servos at consistent levels despite the servo markings having twice changed—first to LFR, and then to LFC.[134] This undermines Trexler's opinion and supports Holt's conclusion that purchasing decisions were based on factors other than the RSA Marks.

As Holt stated during the *Daubert* hearing, Trexler's opinion that "all sales would be lost but-for the use of a trademark is a very dangerous place to be."[135] Holt explained:

> Any damage expert would be frightened that during the case the trademark would change, and you would be proven wrong, that your causality would be completely shown to be untrue.
>
> So that's a very dangerous place. And most trademark experts will be very careful that they can absolutely prove it, for the fear that if it changed mid-case and now you see that all the sales still go to the person, you would be—that would not be allowed. The Court would not allow that. And the reason is because your theory under lost profits is but-for the use of that mark, you would make all the sales.

---

[134] *See Daubert* Hearing Ex. CD-3.
[135] Doc. 451 at 136.

And the problem is that when that name changes and you can see that that's not true, that means that the causality was not there.[136]

Thus, the fact that servo sales were unchanged after AVStar ceased using RSA Marks is highly damaging to Trexler's expert opinion, and her opinion seems to rest upon the slenderest of factual reeds. While the Court has serious concerns with Trexler's opinion, such concerns usually go to the weight afforded to an opinion, rather than its admissibility. As the United States Court of Appeals for the Eighth Circuit has explained:

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.[137]

There appears to be at least some factual support for Trexler's expert opinion, and that opinion, while weak, is not wholly incredible. Trexler's opinion will therefore be admitted and reevaluated after the Court has had the opportunity to examine all pertinent evidence in this matter.[138] After receiving any relevant

---

[136] *Id.* at 136-37.

[137] *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005).

[138] The Court is particularly concerned with two aspects of Trexler's opinion. First, as Holt noted, there is almost no evidence that the RSA Marks actually drove Avco's purchase of AVStar servos. (Doc. 451 at 138). Without further evidence supporting Trexler's opinion that (1) continual use of the RSA Marks during litigation and (2) the contractual obligation to use RSA Marks indicates that Avco would only purchase servos with RSA Marks, there is a strong likelihood that her opinion will be excluded. Relatedly, Trexler must be prepared to better rebut evidence related to AVStar sales of servos bearing the LFC/LFR Marks—evidence that appears to be quite harmful to TNB's claim for damages. Second, Holt testified regarding the idea of "price elasticity," or the concept that an entity will purchase fewer items when the price increases. (*Id.* at 137-38). This concept may not be applicable here: it would seem, from a lay

evidence, the Court will be in a better position to evaluate whether Trexler's opinion is so unsupported by the evidence that it is inadmissible. Because this is a bench trial, there is little risk to initially permitting Trexler's opinion because, as the United States Court of Appeals for the Second Circuit has noted, "there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial."[139]   Accordingly, Avco's motion to exclude Trexler's lost profit calculations will be conditionally denied, subject to reevaluation during trial.

Finally, Avco argues that Trexler's opinion regarding disgorgement of Avco's profits is too speculative to be admitted.[140]   Specifically, Avco asserts that Trexler simply applied a 30% profit margin to all AVStar servos used in Avco engines, without accounting for whether any of the purchases of Avco engines were based the model of servo used within the engine.[141]   Additionally, Avco contends that this Court found Avco only contributorily liable for AVStar's infringement and, thus, there is no basis for disgorgement of Avco's profits.[142]

---

perspective, that Avco would likely not order a large surplus of servos but, rather, would order quantities commensurate with their engine sales.  However, if unrebutted, this concept may further undermine Trexler's opinion—particularly since AVStar servos were 51% less expensive than Precision—and Trexler should be prepared to address this issue at trial.  (Doc. 451 at 70).

[139] *Fed. Trade Comm'n v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) (internal quotation marks omitted).  *See also Whitehouse Hotel Ltd. P'ship v. Comm'r of Internal Revenue*, 615 F.3d 321, 330 (5th Cir. 2010) (noting that "the importance of the trial court's gatekeeper role is significantly diminished . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence").

[140] Doc. 433 at 20-22.

[141] *Id.*

[142] *Id.* at 21-22.

TNB replies that Trexler's disgorgement analysis is not speculative, since RSA Marks have a well-established secondary meaning that may have aided Lycoming engines' reputations, and other evidence supports the conclusion that one hundred percent of sales from AVStar to Avco would have instead gone to Precision absent the infringement.[143]

Trexler's methodology is not wholly speculative.  She explained that, as with AVStar sales, she believed that 100 percent of profits from AVStar servos that were placed in Avco/Lycoming engines should be disgorged from Avco.[144]  However, because Avco "doesn't track . . . its engine revenue[] by component" Trexler needed to come up with an alternative method of calculating the profits that Avco derived from the inclusion of infringing AVStar servos in the engines that Avco sold.[145]  Trexler thus conducted market research and determined that "companies in aircraft engine and parts industry . . . generally have profits between 31 and 35 percent."[146]  Using that number as a benchmark, Trexler assumed that Avco marked up the cost of servos by 30 percent "so they could hit that 30 percent [profit] margin" on the sale of its engines.[147]  There is at least some data to support Trexler's calculations, and there does not appear to be any better method to determine profits from Avco's inclusion of AVStar servos in its engines.

---

[143]  Doc. 439 at 17-20.
[144]  Doc. 451 at 23, 31.
[145]  *Id.* at 31.
[146]  *Id.* at 33.
[147]  *Id.*

Moreover, although it may well be that less than 100 percent of profits from Avco's sales of engines that incorporate infringing AVStar servos should be disgorged, TNB only bears "the burden of establishing the defendants' gross revenue from infringement."[148]   It is then Avco's "burden . . . to apportion the revenues between their infringing and non-infringing conduct."[149]   Trexler's failure to so do does not therefore render her opinion inadmissible.   Additionally, while there is some basis to conclude that Avco's profits should not be disgorged, it is at least arguable that Avco was unjustly enriched from the infringement; Avco's attacks on Trexler's opinion related to disgorgement of Avco's profits thus goes more to weight than admissibility, and is a matter better left for resolution at trial.

## C.    Remaining Motions

TNB further moves to exclude evidence or argument related to matters already decided by the Court.[150]   TNB asserts that it reasonably anticipates that Avco will seek to relitigate issues that were decided by this Court at the summary judgment stage, including questions of whether (1) the RSA Marks are valid, (2) the infringement caused confusion, and (3) any infringement was intentional and deliberate.[151]   If such evidence were not excluded, TNB argues, trial would be

---

[148]   *William A. Graham Co. v. Haughey*, 568 F.3d 425, 431 n.5 (3d Cir. 2009).
[149]   *Id.*
[150]   Docs. 428, 429.
[151]   Doc. 429 at 6-8.

delayed by irrelevant witnesses and evidence that would simply distract from the only remaining issues in this case—the amount of damages to be awarded to TNB.[152]

Avco agrees that the validity of the RSA Marks has been found as a matter of law, and therefore does "not intend to challenge that finding in the damages trial proceeding."[153]  Avco responds, however, that actual confusion is relevant to damages, and it should have the opportunity to demonstrate that AVStar sales were not derived from the infringing use.[154]  As to intentional infringement, Avco contends that, in the summary judgment motion, this Court determined intentionality only in the context of liability, but did not decide the issue of willful infringement, which is critical to any damages analysis.  Because TNB never sought summary judgment on this issue, Avco did not have the opportunity to submit evidence demonstrating that any infringement was not willful.[155]  Finally, Avco asserts that TNB's motion is an improper attempt to remove broad and unspecified categories of evidence from trial.[156]

With respect to intentional infringement, the Court previously concluded that Avco intentionally *used* TNB's trademark but made no finding as to whether Avco intentionally *infringed* upon TNB's trademark.  For example, on page five of this Court's summary judgment Memorandum Opinion of April 9, 2018, it noted that

---

[152]  *Id.*
[153]  Doc. 437 at 2.
[154]  *Id.* at 11-12.
[155]  *Id.* at 4-10.
[156]  *Id.* at 12-14.

evidence demonstrated "an obligation on the part of AVStar to use the same RSA-based model numbers used by Precision WA."[157]   The Court also listed examples of instances where Avco directed the "use" of RSA Marks.[158]

Importantly, the Court's findings in the summary judgment Memorandum Opinion were in furtherance of determining whether the RSA Marks had a "secondary meaning," which was critical in finding that those marks are valid and protectable.[159]   The secondary meaning inquiry does not focus on whether there was intentional infringement but, rather, whether there was intentional copying of a mark.[160]   This distinction is important, as one may intentionally copy a mark without knowledge that the mark was protected.[161]   Thus, this Court's 2018 summary judgment ruling did not address the question of whether Avco intentionally infringed upon the RSA Marks.

---

[157]   Doc. 356 at 5.

[158]   *Id.* at 5 n.19.

[159]   *See id.* at 20-22.

[160]   *See Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 297 (3d Cir. 1991) (noting that "evidence of copying" is a "vitally important factor" in determining secondary meaning); *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 436 (6th Cir. 2017) ("Circumstantial evidence of copying, particularly the use of a contested mark with knowledge that the mark is protected, may be sufficient to support an inference of intentional infringement where direct evidence is not available").

[161]   *Cf. Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 514 (6th Cir. 2013) ("The clear import of the twin principles that copying in the absence of copyright or patent protection often serves useful purposes, and that the concern of trademark law is not about copying per se but about copying that engenders consumer confusion, is that the appropriate 'intent' to focus on is not the intent to *copy* but rather the intent to *deceive* or *confuse*").

Moreover, evidence of whether Avco intentionally infringed upon the RSA
Marks is important in determining whether to award damages, and in what amount.
The Third Circuit has held that "in evaluating whether equity supports disgorging
the infringer's profits," courts should examine six non-exhaustive factors, one of
which is "whether the defendant had the intent to confuse or deceive."[162]  Thus,
evidence of whether Avco intentionally infringed on the RSA Marks is relevant to
the remaining issue that will be explored at trial, and TNB's motion will be denied.

As to TNB's motion to exclude evidence related to confusion, although this
Court previously concluded that there was a likelihood of confusion, and at least
some instances of actual confusion,[163] that finding does not preclude Avco from
offering evidence related to actual confusion on the part of Avco for two reasons.

First, evidence of confusion—and an intent to confuse—are relevant to
whether damages should be awarded in the first instance.  Another of the factors to
consider in whether to award damages is "whether sales have been diverted" due to
the infringement.[164]  If there were no confusion amongst the purchasers at Avco,
there is less likelihood that sales from AVStar to Avco were diverted from Precision.

Second, and relatedly, evidence of what drove Avco's purchases of AVStar
servos is relevant to apportionment of damages.  As Holt explained during the

---

[162] *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005) (internal quotation marks omitted).
[163] Doc. 356 at 21 n.94.
[164] *Banjo Buddies*, 299 F.3d at 175.

*Daubert* hearing, the absence of confusion and the decision to buy servos based on factors other than the RSA Marks are simply "two sides of one coin"[165] and "[y]ou either bought because of price, quality, on-time delivery and the relationship . . . [o]r . . . you were making the purchase decision because of the confusion."[166]  While evidence of confusion is relevant to apportionment, its relevance is limited, and Avco's leeway to explore such evidence will be highly circumscribed at trial.

Finally, Avco has filed a motion to strike TNB's reply brief,[167] which Avco asserts has been improperly filed without leave of the Court.[168]  Alternatively, Avco asks the Court to accept its sur-reply brief.[169]  TNB responds that its brief was appropriate because it needed to respond to issues raised for the first time at the *Daubert* hearing and needed to respond to alleged inaccuracies in Avco's brief.[170]

Avco is correct that the Court did not authorize TNB to file a reply brief.  To the contrary, when counsel for TNB noted that he may wish to file a reply brief, this Court deferred a decision on his request, but noted that it would issue an Order that memorialized a briefing schedule.[171]  The Court issued a scheduling order the following day that authorized TNB to file a supplemental brief, and Avco to file a

---

[165] Doc. 451 at 175.
[166] *Id.*
[167] Doc. 457.
[168] Doc. 458 at 5.
[169] *Id.* at 6-10.
[170] Doc. 459.
[171] Doc. 451 at 253.

response brief two weeks thereafter.[172]  The Court did not authorize TNB to file a reply brief.  Although TNB asserts that its reply brief is permitted under Local Rule 7.7, the Local Rules are clear that an Order of the Court that is inconsistent with the Local Rules suspends those rules to the extent that the two are inconsistent.[173] Accordingly, under this Court's Briefing Order, TNB's reply brief was not authorized.

While neither TNB's reply brief nor Avco's sur-reply brief are authorized— and neither are terribly helpful to the Court—the best solution to the dispute at this point in time is simply to accept both briefs.  Consequently, Avco's motion to strike will be denied, but the Court will accept its sur-reply brief.  Counsel for Avco and TNB are admonished, however, that the Court expects strict compliance with its Orders.  We are rapidly approaching the end of this litigation, and this matter should not devolve into bickering about minor and peripheral procedural matters.

## III.   CONCLUSION

In accordance with the above discussion, TNB's motion to exclude is granted in part and denied in part and its request for sanctions denied, while its motion to exclude evidence or argument related to matters already decided by the Court is

---

[172] Doc. 452.

[173] *See* Local Rule 1.3 ("When a judge of this court issues any order in a specific case which is not consistent with these rules, such order shall constitute a suspension of these rules for such case only and only to the extent that it is inconsistent").

denied.  Avco's motion to exclude is conditionally denied, as is its motion to strike, while its request to submit a sur-reply brief is granted.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge