## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AVCO CORPORATION, | No. 4:12-CV-01313 |
| Plaintiff-Counterclaim Defendant, | (Chief Judge Brann) |
| v. | |
| TURN AND BANK HOLDINGS, LLC, AND PRECISION AIRMOTIVE, LLC, | |
| Defendants-Counterclaim Plaintiffs, | |
| v. | |
| AVSTAR FUEL SYSTEMS, INC., | |
| Counterclaim Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### MARCH 2, 2023

## I.    BACKGROUND

In 2015, Avco Corporation ("Avco") filed a second amended complaint in which it sought declaratory judgment holding that AVStar Fuel Systems, Inc. ("AVStar") and Avco had not infringed on Turn and Bank Holdings, Inc.'s ("TNB") trademarks, and seeking cancellation of several of TNB's trademarks related to airplane engine fuel injection systems known as "servos."[1] TNB in turn filed a

---

[1]   Doc. 138.

counterclaim asserting that AVStar and Avco were liable for trademark infringement and unfair competition under the Lanham Act and Pennsylvania common law related to AVStar's use of TNB's "RSA" Marks, which are used on servos produced by Precision Airmotive Corporation ("Precision").[2]

Based on the facts underlying this matter, in April 2018, this Court granted TNB's motion for summary judgment and denied Avco's[3] motion for summary judgment.[4] The Court concluded that TNB had established as a matter of law that the RSA Marks are valid and legally protectable, and that AVStar's use of the marks was likely to cause consumer confusion.[5]

Specifically, the Court determined that the primary significance of the RSA Marks is to refer to TNB servos and was not simply a generic descriptor, and the descriptive marks had acquired a secondary meaning associated with TNB's servos.[6] As part of that determination, this Court found that Avco's use of the RSA Marks was intentional and had "resulted in several instances of actual confusion."[7] The Court further concluded that Avco's use of the RSA Marks produced a likelihood of confusion, as Avco and TNB directly competed in the servo market for the same

---

[2] Doc. 144. Although there are several iterations of Precision, the Court refers them as a single entity in this document.

[3] Unless legally or factually significant, AVStar and Avco will be referred to collectively as Avco, while TNB and Precision will be referred to collectively as TNB.

[4] Docs. 356, 357.

[5] Doc. 356.

[6] *Id.* at 16-22.

[7] *Id.* at 21.

customers, Avco deliberately used identical model numbers, and there was evidence of actual confusion.[8] Finally, the Court determined that Avco could not establish fair use.[9] To that end, Avco's use of the RSA Marks was not descriptive of its own products rather than TNB's, and was not used in a descriptive sense or in good faith.[10]

The Court therefore entered judgment on the issue of liability as to all counterclaims.[11] Approximately three months later, in the summer of 2018, AVStar ceased using the RSA Marks on its servos.[12] In December 2019, the parties filed competing motions to exclude expert testimony: TNB sought to exclude the testimony of Avco's damages expert, Krista Holt, while Avco sought to exclude the testimony of TNB's damages expert, Dana Trexler.[13] The Court mostly denied those motions,[14] leaving only a jury trial on the question of whether Avco's infringement was willful, and a bench trial on the issue of damages.

A five-day jury trial commenced on October 17, 2022, after which a jury determined that Avco had willfully infringed upon TNB's trademarks by using the RSA Marks.[15] The Court thereafter held a two-day bench trial on the issue of

---

[8]  *Id.* at 23-24.
[9]  *Id.* at 25-26.
[10]  *Id.*
[11]  *Id.*
[12]  *E.g.*, Avco's Jury Trial Exhibit 433.
[13]  Docs. 430, 432.
[14]  Docs. 461, 462.
[15]  Doc. 579.

damages, which commenced on November 9, 2022. Set forth below are this Court's findings of fact and conclusions of law regarding damages following the bench trial. In accordance with the following reasoning, this Court holds that TNB is entitled to an award of disgorged profits. Consequently, the Court will enter judgment in favor of TNB and award damages in the sum of $264,818.

## II.   FINDINGS OF FACT

1.   Servos operate by delivering a mixture of fuel and air to aircraft engines. To ensure optimal engine performance, however, the amount of fuel delivered must be precisely regulated. In the middle of the 20th century, a company known as the Bendix Corporation ("Bendix") created a fuel injection system that accomplished this regulation by measuring the force of the air being pulled into the engine. Bendix eventually assigned servo model numbers to these servos that began the with letters "RSA"—e.g., RSA-5AD1 and RSA-10AD1 (hereinafter "RSA Marks").[16]

2.   Bendix manufactured servos bearing RSA Marks until it sold the rights to the entire product line to Precision in 1988. Precision, in turn, manufactured those servos until 2013, when it sold all of its assets— including the servo product line—to TNB. Since then, servos bearing

---

[16]   Doc. 356 at 2-3.

the RSA Marks have been manufactured by Precision pursuant to a licensing agreement with TNB.[17]

3.      Lycoming Engines ("Lycoming"), a division of Avco, manufactures airplane engines. For decades, Lycoming purchased servos from Precision and its predecessors, including servos bearing the RSA Marks.[18]

4.      Around 2004 or 2005, AVStar began to reverse-engineer some of the RSA-labeled servos for possible manufacture and sale. Around that time, the relationship between Avco and Precision became rocky,[19] and Avco later asked AVStar to complete the reverse engineering process to manufacture and sell servos to Avco for use in its engines.[20]

5.      Between 2007 and 2008, AVStar and Avco signed a series of agreements codifying an arrangement to create and manufacture the servos, which included an obligation for Avco to pay approximately $2,000,000 to AVStar in furtherance of such servo development and an obligation on the part of AVStar to use the RSA Marks.[21]

---

[17]  *Id.* at 4.
[18]  *Id.* at 2. Unless factually relevant, Lycoming is referred to in this document as Avco.
[19]  *E.g.*, Doc. 605 at 16-17.
[20]  Doc. 356 at 4-5.
[21]  *Id.* at 5.

6.      In 2010, AVStar began selling its servos bearing the RSA Marks to Avco and, in August 2012, Avco sold its first engine containing an AVStar-manufactured servo that bore the RSA Marks.[22]

7.      All parties agree that there was a souring relationship between Avco and TNB, but the parties dispute why Avco ultimately decided to buy servos from AVStar that bore the RSA Marks, rather than from Precision.

8.      TNB contends that, because Avco mandated the use of the RSA Marks, and because there were only two suppliers of servos with RSA Marks, Avco purchased AVStar servos because of the RSA Marks.[23]

9.      Unsurprisingly, Avco asserts that it purchased AVStar servos for reasons unrelated to the RSA Marks—and the evidence presented at trial bears out that assertion.

10.     First, Avco grew disillusioned with Precision in part because of pricing issues. The evidence reflects that Avco believed—based on certain indices such as the consumer price index and cost of materials—that Precision requested unreasonable year over year price increases. However, when Avco challenged these price increases, Precision flexed its monopolistic muscle as the sole supplier of servos to Avco and

---

[22]  *Id.* at 5-6.
[23]  Doc. 604 at 165, 178-79; Doc. 605 at 202-03.

presented Avco with a "take it or leave it proposition."[24] As of the date of the bench trial, Precision servos cost approximately 49% more than AVStar servos,[25] although at least some of this price differential is due to economies of scale and the fact that Precision now primarily produces and sells to Avco less popular models of servos.[26]

11.  Second, Avco encountered quality issues with Precision servos, which frequently created issues when testing newly produced engines and led to customer complaints.[27]

12.  Third, Avco employees described Precision as being difficult to work with and "less than cooperative" when issues arose with its servos.[28]

13.  Fourth, issues arose around the timely delivery of servos to Avco. Servos were not always delivered on time, which slowed Avco's production and forced the company to change its production procedures to accommodate these late deliveries. Precision had previously stopped supplying Avco with servos during a dispute, which resulted in a shutdown of Avco's engine production.[29]

---

[24]  Doc. 587 at 188-89.
[25]  Doc. 605 at 79.
[26]  Doc. 604 at 43.
[27]  Doc. 587 at 196-96; Doc. 588 at 39.
[28]  Doc. 587 at 186.
[29]  *Id.* at 89-91; Doc. 589 at 89-91.

14.    Fifth, Avco believed that having a second supplier of servos would generally be beneficial for Avco. With a single supplier, Avco is reliant on that supplier making timely deliveries to maintain Avco's production schedule and to timely deliver engines to its customers, and there have been instances in the past where a supplier (not Precision) had suffered a fire or worker strike that disrupted Avco's production. Additionally, a single supplier can act monopolistically and issue "take it or leave it" propositions and may fail to work with Avco to make on-time deliveries.[30]

15.    The evidence demonstrates that, after AVStar ceased using the RSA Marks on its servos in the summer of 2018 and switched to new model numbers, its sales increased.[31] This increase reflected an increase in both unit sales and revenue.[32]

16.    There have been several instances of actual confusion where individuals or companies were confused about the relationship between Precision and AVStar.[33]

17.    No evidence has been presented that individuals or entities were confused about the identity of the manufacturer of servos at the time of

---

[30]    Doc. 587 at 187, 189-91.
[31]    Avco's Jury Trial Exhibits 433, 444; Doc. 604 at 191; Doc. 605 at 77.
[32]    Doc. 605 at 32-33.
[33]    Doc. 356 at 21.

8

the purchase of any servo. Avco was not confused about the manufacturer of the servos when it purchased AVStar servos that bore the RSA Marks.[34]

## III.   CONCLUSIONS OF LAW

### A.   Standard of Review

#### 1.   Lost Profits

Under the Lanham Act, once a trademark violation has been established, a trademark holder is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."[35] When pursuing compensation for profits lost as a result of trademark infringement, "[t]he owner [of the trademark] has the burden of proving that lost profits are attributable to the unlawful use of the mark."[36] Furthermore, plaintiffs are only entitled to recover profits that "the plaintiff would have earned but for the infringement."[37] "In order to recover actual damages . . . a plaintiff must demonstrate that 'the violation caused actual confusion among consumers of the plaintiff's product.'"[38]

---

[34]   *See* Doc. 604 at 189 (testimony of TNB's damages expert, Trexler: "I think it's already, you know, been in the record that Avco wasn't confused. Of course they weren't confused").

[35]   15 U.S.C. § 1117(a).

[36]   *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 242 n.15 (3d Cir. 2003).

[37]   *Am. Auto. Ass'n of N. Cal., Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1105 (N.D. Cal. 2019) (quoting *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993)).

[38]   *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 500-01 (W.D. Pa. 2011) (quoting *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1204-05 (7th Cir. 1990)).

### 2.    Disgorgement of Infringer's Profits and Treble Damages

As the United States Court of Appeals for the Third Circuit has explained with respect to damages under the Lanham Act, "Section 35(a) of the Lanham Act provides for the disgorgement of an infringer's profits, 'subject to the principles of equity.'"[39] Disgorgement of profits is available as a remedy "if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement."[40] Because a balancing of the equities is required, "disgorgement does not follow as a matter of course upon the mere showing of an infringement, and, for example, will be denied where an injunction satisfies the equities of a case."[41]

> To "evaluate whether equity supports disgorging the infringer's profits," [courts must] consider "(1) whether the infringer had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off."[42]

When seeking to disgorge profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction

---

[39]   *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 223 (3d Cir. 2021) (quoting 15 U.S.C. § 1117(a)).

[40]   *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 178 (3d Cir. 2005).

[41]   *Kars 4 Kids*, 8 F.4th at 223 (internal quotation marks omitted).

[42]   *Id.* (quoting *Banjo Buddies*, 399 F.3d at 175 (brackets omitted)). As this implies, unlike an award of damages for lost profits, for disgorgement of profits a plaintiff need not show any actual confusion. *Zurco*, 785 F. Supp. 2d at 501.

10

claimed."[43] Such deductions include "profits demonstrably not attributable to the unlawful use of" the plaintiff's trademark.[44]

"When an award is based on [disgorged] profits, which 'is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case'" which may amount to three times the total disgorged profits.[45] "If the court increases the monetary award, such an enhancement 'shall constitute compensation and not a penalty.'"[46] "Generally, actual, proven profits will adequately compensate the plaintiff."[47] "Thus, in most cases, when disgorging profits, the district court should award actual, proven profits unless the infringer gained more from the infringement than the infringer's profits reflect."[48] Importantly, "[w]hile 'willful infringement is central' to the decision whether to enhance damages . . . [the Third Circuit has] not held that willful infringement is alone sufficient to support an enhanced award."[49]

As the United States Court of Appeals for the Sixth Circuit has explained in relation to trebled damages, "[r]ecognizing that a fact finder might sometimes have trouble identifying the precise amount of profits generated by a defendant's

---

[43]   15 U.S.C. § 1117(a).
[44]   *Members 1st Fed. Credit Union v. Metro Bank*, No. 1:09-CV-1171, 2011 WL 208743, at *5 (M.D. Pa. Jan. 21, 2011) (quoting *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942)).
[45]   *Kars 4 Kids*, 8 F.4th at 224 (quoting 15 U.S.C. § 1117(a)).
[46]   *Id.* (quoting 15 U.S.C. § 1117(a)).
[47]   *Id.* (internal quotation marks omitted).
[48]   *Id.* (alterations and internal quotation marks omitted).
[49]   *Id.* at 225 (quoting *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir. 1999)).

infringement, Congress gave district courts the discretionary power to adjust a profits award up or down."[50] "Yet the Act imposes a clear limit on this discretionary power: 'Such sum shall constitute compensation and not a penalty.'"[51]

> This language distinguishes between two types of adjustments. On the one hand, the court may increase a profits award for a compensatory reason, such as a concern that the award does not encompass the defendant's full profits. Perhaps the defendant received intangible benefits as a result of its infringing conduct. Or perhaps the defendant engaged in discovery "stonewalling" that prevented the plaintiff from identifying its total infringing sales.

> On the other hand, the court may not increase a jury's profits award for a punitive reason. The record might show such an improper purpose, for example, if the court highlighted the defendant's bad faith as the basis for the increase. Or such an improper purpose might exist if the court increased the profits to penalize the defendant for discovery violations, something that other laws and court rules are better equipped to handle.[52]

### 3. Attorneys' Fees and Punitive Damages

The "Lanham Act . . . permits the recovery of reasonable attorneys' fees only 'in exceptional cases.'"[53] The Third Circuit has explained that, pursuant to United States Supreme Court precedent, "a district court may find a case 'exceptional,' and therefore award fees to the prevailing party, when (a) there is an unusual discrepancy

---

[50] *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 473 (6th Cir. 2022).
[51] *Id.* (quoting 15 U.S.C. § 1117(a)).
[52] *Id.* (internal citations omitted).
[53] *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 313 (3d Cir. 2014) (quoting 15 U.S.C. § 1117(a)).

in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'"[54]

"Thus, it is within a court's discretion to find a case 'exceptional' based upon 'the governing law and the facts of the case,' irrespective of whether the losing party is culpable. For example, 'a case presenting exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award.'"[55] "Whether litigation positions or litigation tactics are 'exceptional' enough to merit attorneys' fees must be determined by district courts 'in the case-by-case exercise of their discretion, considering the totality of the circumstances.'"[56] "The losing party's blameworthiness may well play a role in a district court's analysis of the 'exceptionality' of a case," but culpability is not a requirement to award attorneys' fees.[57]

Turning to punitive damages, because plaintiffs are not "entitled to punitive damages under the Lanham Act," any claim for punitive damages must flow from state law.[58] Under Pennsylvania law, it is well established that "[p]unitive damages are an 'extreme remedy' available only in the most exceptional circumstances."[59]

---

[54] *Id.* at 315 (quoting (*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

[55] *Id.* at 314 (quoting *Octane Fitness*, 572 U.S. at 555 (ellipsis omitted)).

[56] *Id.* at 315 (quoting *Octane Fitness*, 572 U.S. at 555).

[57] *Id.*

[58] *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975). *See also Lontex Corp. v. Nike, Inc.*, No. CV 18-5623, 2021 WL 2138621, at *2 (E.D. Pa. May 26, 2021) (noting that punitive damages are "unavailable under the Lanham Act").

[59] *Hall v. Episcopal Long Term Care*, 54 A.3d 381, 395 (Pa. Super. Ct. 2012).

"Additionally, punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others."[60] Moreover, "the size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion."[61] "In accordance with this limitation, the standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant."[62]

## B.   Application of the Law to the Facts of this Case

### 1.   Lost Profits

The Court first addresses TNB's request for damages in the form of lost profits; TNB asserts that but-for causation is established primarily due to Avco's decision to mandate that AVStar use RSA Marks for its servos.[63] The Court finds that lost profits are not appropriately awarded.

It is clear, based upon the testimony presented at trial—along with the other evidence of record produced during the course of this litigation—that at some point

---

[60]   *Id.* (brackets omitted).
[61]   *Brown v. End Zone, Inc.*, 259 A.3d 473, 487 (Pa. Super. Ct. 2021).
[62]   *Id.*
[63]   Doc. 613 at 26-34.

the relationship between Avco and Precision deteriorated precipitously. TNB has asserted throughout this litigation that Avco helped create AVStar, mandated the use of RSA Marks on AVStar servos, and bought AVStar servos with the sole motive of destroying Precision.

The problem with TNB's assertion is two-fold. First, as noted in the findings of fact above and as discussed in more detail below, the Court concludes that Avco purchased AVStar servos for a variety of reasons other than the RSA Marks—indeed, none of the sales of AVStar servos are demonstrably attributable to the RSA Marks, meaning that TNB has failed to establish that, but-for the infringement, Precision would have made all of the relevant servo sales. Second, even if TNB is correct that Avco sought to destroy Precision, this is a trademark infringement case, not a business tort action. If in fact Avco helped to create AVStar and purchased AVStar servos in an effort to destroy Precision,[64] then it necessarily did not purchase AVStar servos due to the RSA Marks, but would have purchased AVStar servos in its efforts to destroy Precision, regardless of the model number employed by AVStar. As a consequence, there would be no trademark damages.

---

[64] Although not legally dispositive, the Court notes that TNB's assertion that Avco sought to destroy Precision is strongly contradicted by the evidence and logic. The evidence presented at trial establishes that Precision remains the sole manufacturer of several models of servos that Avco uses in its engines, and that Avco remains one of Precision's largest customers. Doc. 587 at 125; Doc. 604 at 43; TNB's Bench Trial Exhibit 147. It makes no logical sense to believe that Avco would have sought to destroy Precision, thereby depriving itself of the sole manufacturer of a product that is a necessary component in many of Avco's engines.

As noted above, it is TNB's burden to prove but-for causation.[65] TNB has failed to sustain that burden for three reasons. First, it is undisputed that Avco was not confused about the manufacturer of servos when it purchased servos from AVStar that bore the RSA Marks,[66] and Avco accounts for 98% of AVStar's servo sales.[67] Second, the evidence convincingly establishes that Avco purchased AVStar servos for reasons other than the RSA Marks, including: issues with Precision's pricing and its ability to issue "take it or leave it" demands for price increases; quality issues with Precision servos; Precision was a difficult entity with which to work; Precision's ongoing issues making timely deliveries; and Avco's preference to have two servo suppliers.

Third, and most critically, the available real-world data demonstrates that AVStar sales were not driven by its use of the RSA Marks, as sales of AVStar servos increased after it ceased using the RSA Marks on its servos.[68]

As Krista Holt, Avco's expert witness in damages, testified, not only is it clear from the testimony of the relevant individuals involved in Avco's purchasing decisions that Avco purchased AVStar servos for reasons other than the RSA Marks,[69] but the available sales data after AVStar ceased using the RSA Marks

---

[65]  *Gucci*, 354 F.3d at 242 n.15; *Gen. Motors LLC*, 367 F. Supp. 3d at 1105.
[66]  Doc. 604 at 189.
[67]  Doc. 590 at 154; Doc. 604 at 166; Doc. 605 at 73.
[68]  Avco's Jury Trial Exhibits 433, 444; Doc. 604 at 191; Doc. 605 at 32-33, 77.
[69]  Doc. 451 at 134-35, 138-41, 156-62; Doc. 605 at 15-17.

leaves little room to reach any other conclusion.[70] Holt explained during the bench

trial:

> When I say we see no difference [in sales], what I mean is we do not
> see a drop in sales. We do not see that the price went down. What we
> see is that there's a steady increase. There's—the industry does not care
> what model number is on the servo. What they care is that they're
> getting a Lycoming engine, and that Lycoming is their supplier. And
> that's what they care about. And we can see this proven by the
> numbers.[71]

Holt iterated that this sales data demonstrated the absence of causation between the

RSA Marks and AVStar servo sales to both Avco and third parties:

> Causation is that if the name were changed, the sales would go to
> Precision. That is the theory of lost profits . . . [b]ut-for the trademark
> infringement, the sales would have gone to Precision. The trademark
> did change, the infringement did stop, and yet, we still see that the sales
> did not go to Precision" but instead continued to go to AVStar.[72]

All of this is to say that the sales data demonstrating that AVStar servo sales

increased after it ceased using the RSA Marks is the single most powerful piece of

evidence presented at trial. Although TNB could plausibly have argued—prior to

AVStar having ceased to use the RSA Marks—that all of AVStar's sales were due

to the RSA Marks since Avco mandated use of those marks,[73] such a contention

---

[70]  Doc. 451 at 142-48; Doc. 605 at 29-33.

[71]  Doc. 605 at 30-31.

[72]  *Id.* at 31-32. *See also id.* at 33 (Holt explaining that expert witnesses on damages "look
analytically at numbers to see what's happening, because what we have to do under
disgorgement is we have to figure out well how much of the profit of these sales is due to the
mark. And what we see by this, that it's zero of the profit is due to the mark. Because before
they have sales and then afterwards, both their price and their units go up. There is no
difference, other than an increase" in sales).

[73]  Indeed, Trexler offered such an opinion. *See* Doc. 434-1; Doc. 604 at 157-62.

simply does not hold water given AVStar's post-RSA Mark sales data. Because Avco and other third parties continued to purchase AVStar servos after the Marks were removed, it is apparent that sales of those servos were not dependent upon, or driven by, the RSA Marks. This evidence strongly supports Holt's opinion, and the Court accepts that opinion as well-reasoned and persuasive. In contrast, the Court rejects Dana Trexler's opinion as equally unsupported by the evidence.

Trexler thoroughly explained the basis for her opinion during the *Daubert* hearing and bench trial.[74] Trexler testified that her calculation for lost profits is relatively straightforward: because Avco contractually required that AVStar use the RSA Marks, Trexler concluded that Avco would only purchase servos bearing the RSA Marks; this effectively created a two-supplier market, as only AVStar and Precision produced servos with RSA Marks.[75] Trexler also opined that Avco and AVStar must have ascribed some value to the RSA Marks because AVStar continued using those marks "for ten years despite this litigation."[76] Because Avco required servos with an RSA Mark, and because the parties were operating in a two-supplier market, Trexler concluded that 100% of sales from AVStar to Avco were lost profits

---

[74]   The Court primarily relies upon Trexler's testimony at the *Daubert* hearing to explain the basis of her opinion, unless her opinion was modified, updated, or explained in greater detail during the bench trial.
[75]   Doc. 451 at 39-41, 106-07.
[76]   *Id.* at 110.

for Precision as, absent AVStar's infringement, Avco would have had to order those servos from Precision.[77]

Trexler testified that she considered other factors that may have driven Avco's purchasing decisions, such as price, quality, and on-time delivery, but found none of those factors significant because "it really comes back to the fact that it's a two-supplier market."[78]  When only one other supplier is able to supply RSA-marked servos, Trexler believed that no other factors would contribute to sales.[79]  Trexler testified that she also considered that sales of AVStar servos increased after AVStar ceased using the RSA Marks, but found that insignificant as well because Avco and AVStar "are so intertwined . . . [that] it would be difficult to separate the two."[80]

As this Court noted in ruling on the *Daubert* motions, Trexler's hypothesis is weak, and nothing presented at the bench trial undermined that conclusion.[81] Trexler's hypothesis that Avco would only purchase servos with RSA Marks has been disproven by the fact that AVStar has twice changed it servo markings, and its sales to Avco and third parties has only increased.[82] This undercuts Trexler's opinion and supports Holt's conclusion that purchasing decisions were based on factors other than the RSA Marks.

---

[77] *Id.* at 40, 105-06.
[78] *Id.* at 41; *see id.* at 40-41.
[79] *Id.*
[80] *Id.* at 41; *see id.* at 112-13.
[81] Doc. 461 at 34-36.
[82] *See* Avco's Jury Trial Exhibits 433, 444.

Holt stated during the *Daubert* hearing that Trexler's opinion that "all sales would be lost but-for the use of a trademark is a very dangerous place to be."[83]  Holt explained:

> Any damage expert would be frightened that during the case the trademark would change, and you would be proven wrong, that your causality would be completely shown to be untrue.
>
> So that's a very dangerous place. And most trademark experts will be very careful that they can absolutely prove it, for the fear that if it changed mid-case and now you see that all the sales still go to the person, you would be—that would not be allowed. The Court would not allow that. And the reason is because your theory under lost profits is but-for the use of that mark, you would make all the sales.
>
> And the problem is that when that name changes and you can see that that's not true, that means that the causality was not there.[84]

Holt's warning ultimately bears true after the conclusion of the bench trial. No evidence was presented that would demonstrate that AVStar's sales were driven by anything other than Avco's desire to purchase AVStar servos for a variety of reasons other than the model numbers used for those servos. The testimonial evidence revealed that Avco purchased AVStar servos for reasons other than the RSA Marks, and the sales data strongly supported that notion.[85] Consequently, the Court rejects Trexler's opinion on lost profits.

---

[83]  Doc. 451 at 136.
[84]  *Id.* at 136-37.
[85]  Based on the evidence, the Court cannot conclude that TNB has demonstrated that any of AVStar's servo sales were driven, in any part, by the use of the RSA Marks on those servos.

Despite this compelling evidence demonstrating that AVStar sales were driven by factors other than the RSA Marks, TNB and Trexler assert that TNB is still entitled to damages, and that AVStar's post-RSA Mark sales data is irrelevant, because AVStar's use of the RSA Marks allowed it to capture market acceptance.[86] Trexler opined at trial:

> So essentially when you look at the facts and circumstances in this case, you know, it's been found that Avco willfully induced AVStar's infringement. Avco funded AVStar's startup costs and then diverted sales to AVStar. And AVStar is Avco's coconspirator. AVStar uses the RSA marks immediately. And that helps them with market acceptance. And there was a lot of testimony at the jury trial about how this industry does not like change. It likes consistency. Mr. Kraft talked about that. And so AVStar was immediately able to benefit from the use of Precision's goodwill, which helped them to gain market acceptance in the early time period while, you know, and they used that mark for a six-year period until this Court found them to be infringing.[87]

This opinion is unconvincing for several reasons.[88] First, it is uncontested that ninety-eight percent of AVStar sales are made by Avco,[89] and AVStar simply did not need market acceptance with Avco. Second, although Trexler opined that there was market acceptance downstream, the evidence firmly establishes that Avco engine sales are based on factors other than the model of servo used in the engine,

---

[86]  Doc. 604 at 148, 157-62, 188-89, 209-10.

[87]  *Id.* at 148.

[88]  Avco has filed a motion to strike this opinion as a new, untimely opinion. Doc. 610. There are good reasons to conclude that, under the relevant factors set forth in *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904-05 (3d Cir. 1977), Trexler's opinion would be stricken. However, because the Court finds the opinion unpersuasive, it will simply deny as moot Avco's motion. The same reasoning and result applies to any opinion related to downstream confusion.

[89]  Doc. 604 at 11 (opening statement from Richard T. Matthews, Esquire), 189 (testimony from Trexler).

including their price, performance, reliability, relationships, and reputation—indeed, it is generally the case that once an engine is selected for an airplane, that airplane manufacturer has no choice but to purchase that specific engine.[90] Michael Everhart testified that no one has ever inquired as to what type of servo is used in Avco engines.[91]

Third, there is no evidence that AVStar gained downstream market acceptance when mechanics replaced or overhauled AVStar servos. Not only did the evidence at trial—including a working model of an Avco engine—demonstrate that servos cannot be seen when inside of a plane, and are only easily visible when the engine is removed from a plane, but it also established that the work of an aircraft mechanic—whether working on a servo or ordering and replacing one—is driven by the part number of a servo, not its model number.[92] Given that this work is largely driven by part numbers, and the part numbers for AVStar and Precision servos are distinct, there is little chance that AVStar gained market acceptance among third party mechanics by using the RSA Marks.[93]

---

[90]   Doc. 588 at 20-22; Doc. 605 at 12, 14-15, 60-61.
[91]   Doc. 588 at 22.
[92]   Doc. 589 at 39, 95-96; Doc. 596 at 9-10; Doc. 597 at 39-40; Doc. 605 at 65-67. One mechanic, David Czarnecki, testified that mechanics cannot legally "sign off [on] an annual inspection on an aircraft if you haven't taken the time to get the model, manufacturer, serial, and parts list number off the magnetos, off the fuel pump, and off the fuel servo and do your homework first, because you have to know what you're looking at and working on . . ." Doc. 597 at 39-40.
[93]   And no proof of such market acceptance was presented at either the bench trial or jury trial.

In sum, although Trexler opined that Avco engines "get overhauled and repaired downstream. And if—if there is a different RSA servos number when the mechanics go in to take those servos out, that's when the market acceptance and the questions come,"[94] there is simply no evidence in the record to support that those mechanics purchased any servos based on any potential confusion or market acceptance. Nor is there any evidence that would tend to demonstrate that downstream confusion aided AVStar in any way, boosted its sales, or harmed Precision's sales. This is particularly true when, as TNB has repeatedly noted during the course of this litigation, Precision servo sales experienced an initial "dramatic drop" in 2013 when Avco began purchasing AVStar servos,[95] but there was no further decline in Precision sales in future years. To the contrary, Precision servo sales began to increase slightly in later years.[96] Were Trexler's market acceptance theory accurate, one would expect a continued decrease in Precision servo sales in later years as AVStar servos were taken out of Avco engines, mechanics began to associate AVStar with the RSA Marks, and market acceptance was realized. The fact that this did not happen is strong evidence that Trexler's marketplace acceptance theory is incorrect.

Consequently, the Court concludes that, while Avco has presented significant evidence demonstrating that AVStar's sales were not a result of confusion by

---

[94] Doc. 604 at 189.
[95] Doc. 604 at 41.
[96] *See* TNB's Jury Trial Exhibit 450; Avco's Bench Trial Exhibit 435.

purchasers who believed they were buying Precision servos due to AVStar's use of the RSA Marks, TNB has presented no countervailing evidence supporting a conclusion that such confusion drove AVStar sales. This Court has repeatedly held that TNB established actual confusion regarding whether servos were built by Precision or AVStar;[97] however, there is no evidence that any of the two percent of individuals or entities other than Avco who purchased AVStar servos were confused about the identity of the manufacturer of servos *at the time they purchased any servos*. This is critical in a determination of damages, as plaintiffs may only recover profits that they "would have earned but for the infringement."[98] Absent confusion during the purchasing process, there is no evidence of actual lost profits for TNB.

It is beyond peradventure that all servos purchased from AVStar would have instead been purchased from Precision if AVStar did not exist, as there are only two manufacturers of the servos at issue in this case. However, the relevant question is not whether, in the absence of AVStar, any sales would have instead gone to Precision. The question is whether, in the absence of the *infringement* by AVStar/Avco, any sales would have gone to Precision. The evidence of record establishes that the answer to that question is no. In the absence of any evidence demonstrating that TNB actually lost sales due to AVStar/Avco's trademark

---

[97] Doc. 356 at 21.
[98] *Gen. Motors LLC*, 367 F. Supp. 3d at 1105.

infringement, the Court concludes that TNB is not entitled to lost profit damages.[99] Consequently, the Court will deny TNB's request for such damages.

## 2.    Disgorgement of Profits

### a.    Amount of Profits Subject to Disgorgement

The Court next turns to the question of disgorgement of profits. Despite denying any award of damages for lost profits, the Court reaches a different result regarding disgorgement of profits. Unlike lost profits, for disgorgement of profits, the plaintiff's burden is merely to demonstrate "the infringer's sales before the burden of proof shifts to the defendant to show costs and deductions."[100] TNB has clearly satisfied its burden of demonstrating sales that were generated by AVStar servos bearing the RSA Marks and, while Avco has successfully demonstrated that the majority of those sales should be deducted, it has failed to demonstrate that all of the sales of AVStar servos should be deducted.[101]

---

[99]  *Cf. Daffy's Inc.*, 354 F.3d at 242-43 (concluding that plaintiff was not entitled to lost profits damages since "the record does not establish what percentage of Daffy's sales, if any, was the result of the use of Gucci's mark" because, even though "'Gucci' suggests a certain level of quality and prestige," it was "quite possible that the purchasers were motivated by the opportunity of purchasing what appeared to be an attractive handbag of exceedingly high quality at the very favorable price afforded by Daffy's 'discount.' To the extent that consumers were motivated by obtaining such a bargain, the fact that they were also obtaining 'a genuine Gucci' may have been only an incidental factor in their purchase, or no factor at all. In other words, given the quality, attractiveness, and price of the bags, we cannot conclude that Daffy's could not have sold them at the same price even if they contained no reference to 'Gucci'").

[100]  *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 177 (3d Cir. 2017).

[101]  TNB asserts that it would be unjust not to disgorge all profits from both Avco and AVStar, as Avco was a coconspirator that "willfully induc[ed]" AVStar to infringe on TNB's trademarks, and a failure to disgorge those profits would ignore "the realities of the two culpable parties being willfully liable." Doc. 619 at 16. The Court has no doubt that Avco and AVStar willfully infringed on TNB's trademarks—that issue was resolved by a jury following a trial. However, as detailed in this Opinion, the evidence demonstrates that the vast majority of AVStar and

TNB has established—and Avco does not appear to dispute—that an accurate estimate of profits that AVStar and Avco made from servos bearing the RSA Marks is $10,980,278.[102] Having established those sales, the burden shifts to Avco to demonstrate that some portion of those sales should be deducted and not disgorged. Avco has largely succeeded in that task, primarily based, as discussed above, on the strength of Holt's expert opinion and the evidence upon which she relied to formulate her opinion.

As Holt's opinion and the sales data make clear, none of the sales from AVStar to Avco—accounting for ninety-eight percent of AVStar's total sales—were driven by AVStar's use of the RSA Marks. Rather, Avco would have purchased AVStar servos regardless of the RSA Marks, as its purchases were driven by factors other than those marks. Because Avco has successfully demonstrated a "lack of connection between the infringing mark and the actual sales" from AVStar to Avco based upon that infringement, none of those profits are subject to disgorgement.[103]

That leaves as potentially subject to disgorgement profits from AVStar's servo sales to third parties and profits from Avco's engine sales. However, as to profits from Avco's engine sales, Avco has again sustained its burden of proving

---

Avco sales did not occur as a result of the RSA Marks, and equity supports disgorgement only of those profits potentially derived as a result of the trademark infringement. Stated differently, it would be fundamentally unfair to disgorge profits that are wholly unrelated to trademark infringement which, here, make up the majority of Defendants' sales.

[102] TNB's Bench Trial Exhibit 452—1.1, 2.1, 3.0, 3.1.

[103] *Resorts Int'l, Inc. v. Greate Bay Hotel & Casino, Inc.*, 830 F. Supp. 826, 840 (D.N.J. 1992).

26

that the sales and profits were not attributable to the infringing RSA Marks used on the AVStar servos contained within the engines.

As discussed previously, Avco engine sales were, and are, based on factors other than the model of servo used in the engine, including the engines' price, performance, reliability, relationships, and reputation, and the requirement that certain Avco engines be used in certain airplanes.[104] Holt testified convincingly at the bench trial that Avco sales data confirms this conclusion:

> Well, yeah, [Avco engine sales are] going up. So . . . we do not see a drop in sales. We do not see that the price went down. What we see is that there's a steady increase. There's—the industry does not care what model number is on the servo. What they care is that they're getting a Lycoming engine, and that Lycoming is their supplier. And that's what they care about. And we can see this proven by the numbers.[105]

Because Avco engines sales—and the profits derived from those sales—were "demonstrably not attributable to the unlawful use of" the RSA Marks on AVStar's servos contained within the Avco engine, none of those profits are properly subject to disgorgement.[106] TNB argues that it would be unfair and in direct contravention

---

[104] Doc. 588 at 20-22; Doc. 605 at 12, 14-15, 60-61. *See also* Doc. 451 at 164 (Holt opining that Avco's customers purchase Avco engines for numerous reasons, including "the quality, the timely delivery . . . that it will come at a good price, that the quality will be good, . . . that the airplane manufacturer will not shut down its facility because the engine manufacturer can't get them engines on time").

[105] Doc. 605 at 30-31. This testimony mirrored Holt's testimony at the *Daubert* hearing, where she explained "we know . . . that the model number [of the servos] is [not] driving [engine] purchase decision[s], because we already knew when they went from one supplier to two and the marketplace did not reduce the quantity [of engines] they bought from [Avco]. Why didn't they reduce it? And it's because they want a Lycoming engine. Why do they want a Lycoming engine? Certain airplanes have to have that particular engine." Doc. 451 at 164.

[106] *Metro Bank*, 2011 WL 208743 at *5.

of this Court's role sitting in equity to fail to disgorge the aforementioned profits for AVStar and Avco, as such a holding would ignore "the realities of the two culpable parties being willfully liable and intending to deceive the downstream market to gain acceptance for all of AVStar's infringing RSA servos."[107] As discussed above, the Court rejects the downstream confusion theory proffered by Trexler. More importantly, disgorgement is warranted under equity only where TNB/Precision has suffered actual harm. For sales of AVStar servos to Avco and sales of Avco engines, there simply is no evidence that TNB suffered any harm that would render it equitable to disgorge Avco's or AVStar's profits.

Even after such a sizeable deduction, there remains a portion of profits available for disgorgement—profits for sales of infringing servos to third parties, and profits on rebuilt and overhauled servos that bore the infringing RSA Marks,

---

[107]  Doc. 619 at 16.

which Holt calculated as $264,818.[108] Although, as Avco argues,[109] there is no

evidence in the record to support the conclusion that these sales were driven by

AVStar's use of the RSA Marks, TNB does not bear the burden of proof here.

Instead, it is Avco's burden to demonstrate the absence of any connection between

these sales and AVStar's infringement,[110] and Avco has not sustained its burden of

proof in this regard.

Holt testified at the *Daubert* hearing that she "didn't call and interview the

third-party buyers of AVStar" servos and, "because [she] didn't call and interview

them to find out that they made the same purchase decisions," she could not

---

[108] Doc. 612-1 at 46, 52, 59. Holt likewise left a portion of Avco's profits open for disgorgement based upon decisions by third parties to overhaul those AVStar servos in the future, potentially on the basis of confusion. Doc. 276-1 at 37-39; Doc. 4551 at 166-70. She calculated those profits at $541,219. Doc. 612-1 at 46, 60, 63. The Court finds no basis for disgorgement of these profits. Holt explained that it is "possible, though highly unlikely, that a customer of Lycoming decided its engine's servo needed repair would have sent the servo to Lycoming for repair by AVStar rather than another repair vendor as a result [of] the presence of the RSA [M]arks on AVStar servos." *Id.* at 62. However, it does not make logical sense that Precision suffered any harm from such a hypothetical decision. Even if a customer were confused about the manufacturer of the servo, it would have sent the servo to Lycoming for overhaul not because of any confusion, but because the customer had a Lycoming engine. This is borne out by imagining a counterfactual scenario wherein the AVStar servo did not have infringing RSA Marks and the customer was not confused about its manufacture: the customer would again send the servo to Lycoming for an overhaul. Moreover, AVStar is authorized to overhaul both Precision servos and AVStar servos, while Precision may overhaul Precision servos but cannot overhaul AVStar servos, as it decided not to obtain approval to perform such overhauls. Doc. 594 at 29; Doc. 604 at 99. If a customer were confused about the manufacturer of the AVStar servos, it may have sent those servos to Precision to be overhauled, but Precision would have been unable to perform such an overhaul, and Precision would not gain anything, but neither would it lose anything. Were the customer to send, based on confusion, the servo to AVStar instead to overhaul, AVStar would gain profits from that overhaul, but that gain would not be unjust, since Precision could not have performed the overhaul, nor would Precision have been harmed by that decision since it could not have performed the overhaul. Consequently, the Court concludes that this $541,219 in profits for Avco is not subject to disgorgement.

[109] Doc. 612 at 37-43.

[110] 15 U.S.C. § 1117(a). *See also Metro Bank*, 2011 WL 208743 at *5.

definitively state that those sales were based on factors other than the RSA Marks, such as "quality, on-time delivery, [or] pricing."[111] Holt testified that she did not "think [it's] possible" that those sales to third parties were driven by the RSA Marks, but she could not eliminate the possibility that a third party "could have bought [an infringing AVStar servo] confused, thinking that [AVStar was] Precision."[112] No evidence was presented by Avco at trial that demonstrates to the Court that such purchasing decisions were not driven by the RSA Marks used on the infringing AVStar servos.[113] Accordingly, the Court concludes that those $264,818 in sales may be disgorged, subject to the principles of equity.[114]

### b.      Whether Disgorgement is Appropriate

Given that some of AVStar's profits are subject to disgorgement, the Court turns to the question of whether equity supports disgorgement of those profits. The Third Circuit has provided six factors that should be considered in determining whether equity supports disgorgement, including: (1) whether Avco intended to

---

[111] Doc. 451 at 170-71. *See also* Doc. 605 at 83-85.

[112] Doc. 451 at 171.

[113] The list of servo core returns provided by TNB at trial provides some evidence to support the notion that these sales may have been driven by confusion with regard to the RSA Marks although, for the reasons noted by Avco, that return list is relatively weak evidence of confusion. Doc. 612 at 41-43.

[114] Avco notes that "[t]he third parties who purchase AVStar servos are primarily mechanics" who would not be confused as to the servo manufacturer. Doc. 612 at 43-45. However, no testimony at trial established what percentage of the third-party buyers are mechanics, and there is simply no logical manner in which the Court could properly determine which portion of those sales may not be subject to disgorgement. Any attempt by the Court to find less than 100% of those sales subject to disgorgement would be pure guesswork. Consequently, the Court cannot conclude that Avco has sustained its burden to demonstrate that any portion of those sales should be deducted.

confuse or deceive; (2) whether sales were diverted from TNB; (3) the adequacy of other remedies; (4) any unreasonable delay by TNB in asserting its rights; (5) the public interest in making the misconduct unprofitable; and (6) whether this is a case of palming off.[115] Although this presents a close question, considering those factors, the Court concludes that disgorgement of profits is appropriate.

With regard to the first factor, there is evidence in the record that Avco intended to confuse or deceive. The jury determined that Avco and AVStar's infringement was willful[116] after being instructed that "willful infringement consists of more than accidental or careless encroachment of another's rights" and, instead, "involves an intent to infringe or a deliberate disregard of the mark holder's rights in a way that was calculated to appropriate or otherwise benefit from the goodwill that the market holder had nurtured."[117] This determination by the jury supports the conclusion that Avco intended to deceive or confuse—and thereby sought to appropriate Precision's goodwill—which in turn supports disgorgement of profits.

As to the second factor, as noted above, there is no evidence that sales were actually diverted from TNB/Precision—it is only possible that some sales to third parties were diverted and, if such sales were diverted, they constitute only a small fraction of AVStar's or Precision's sales. This factor therefore weighs against disgorging profits. The third factor weighs against disgorgement; AVStar ceased

---

[115] *Kars 4 Kids*, 8 F.4th 209 at 223.
[116] Doc. 579.
[117] Doc. 589 at 240.

using the RSA Marks within three months of this Court's decision granting summary judgment in favor of TNB and its finding that Avco/AVStar's use of the RSA Marks infringed on TNB's trademark,[118] and there is no realistic possibility that AVStar will again use the RSA Marks. Furthermore, disgorgement of profits does not appear to be "necessary to deter infringement" in the future given that Avco has ceased using the RSA Marks.[119]

With respect to the fourth factor, the Court finds no unreasonable delay in TNB attempting to assert its rights as to the RSA Marks. Precision issued demands that AVStar cease using the RSA Marks as early as January 2010—before AVStar servos were ever sold to the public—and followed up that letter with additional letters and a lawsuit.[120] This factor therefore supports disgorging AVStar's profits. The fifth factor is neutral. The jury's determination that Avco and AVStar's actions were willful is indicative of some culpable conduct on Avco's part, although there is no indication that the infringement was profitable, meaning that, while "[i]t is obvious there would be a great public interest in making misconduct unprofitable where there is culpable conduct on the part of the infringer,"[121] such interest is lacking here.

---

[118] Doc. 590 at 159-60.

[119] *Marshak v. Treadwell*, 595 F.3d 478, 495 (3d Cir. 2009).

[120] TNB's Bench Trial Exhibits 19, 20, 79, 80.

[121] *Sabinsa Corp. v. Creative Compounds, LLC*, No. CIV.A. 04-4239 DMC, 2011 WL 3236096, at *6 (D.N.J. July 27, 2011).

Finally, the sixth factor supports disgorgement. "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's."[122] Again, the jury determined that Avco and AVStar's infringement was willful, meaning that they held "an intent to infringe or a deliberate disregard of the mark holder's rights in a way that was calculated to appropriate or otherwise benefit from the goodwill that the market holder had nurtured."[123] This indicates that the infringement was done with the intent to misrepresent AVStar servos as Precision servos.

Weighing the relevant factors, the Court concludes that equity slightly supports disgorging AVStar's profits for sales of infringing servos to third parties. Consequently, the Court will award TNB damages in the sum of $264,818.

### c.      Whether Disgorged Profits Should be Increased

Having concluded that disgorgement of profits is appropriate, the Court turns to the question of whether those damages should be enhanced. Trebling of damages is only appropriate when a monetary award is "inadequate" when considering the equities of the case.[124] Critical to any such analysis is the fact that "[i]f the court increases the monetary award, such an enhancement 'shall constitute compensation and not a penalty.'"[125] Therefore, courts must be careful in enhancing damages,

---

[122] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003).
[123] Doc. 589 at 240.
[124] *Kars 4 Kids*, 8 F.4th at 224.
[125] *Id.* (quoting 15 U.S.C. § 1117(a)).

"because granting an increase could easily transfigure an otherwise-acceptable compensatory award into an impermissible punitive measure."[126]

Here, there is no need to enhance damages, as Avco and AVStar did not "gain[] more from the infringement than the infringer's profits reflect."[127] As discussed previously, the Court rejects the notion that AVStar gained any market acceptance as a result of the use of the RSA Marks, and there is no evidence that its prestige or reputation was otherwise enhanced by use of the RSA Marks.[128] Nor can the Court discern any other "intangible benefits" that the companies gained as result of the infringing conduct.[129]

Similarly, there is no risk that "actual, proven profits will [not] adequately compensate" TNB.[130] To the contrary, this Court's award of disgorged profits in the amount of $264,818 likely represents an overestimate of any profits gained from AVStar's use of the RSA Marks,[131] as it is highly unlikely that mechanics, who make

---

[126] *Id.* at 224.

[127] *Id.* (alterations and internal quotation marks omitted).

[128] AVStar likely gained some market acceptance by Avco's use of AVStar servos in Avco engines, which directly injected thousands of AVStar's servos into the airplane market, permitting it to establish a toehold in that market, and introducing those servos to pilots and mechanics who may otherwise have not used those servos. However, Avco's decision to use AVStar servos was based on factors other than the use of the RSA Marks, and these benefits to AVStar cannot be said to have been the result of any infringement.

[129] *Max Rack*, 40 F.4th at 473.

[130] *Kars 4 Kids*, 8 F.4th at 224 (internal quotation marks omitted).

[131] To reiterate, the Court finds that AVStar sales to third parties are subject to disgorgement because Avco has failed to demonstrate what percentage of third-party buyers are mechanics, and there is no logical manner in which to apportion any sales that may not have been due to confusion from sales that may have been driven by confusion. That is to say, disgorged profits are awarded not because TNB has established that those sales were due to infringement, but because Avco has failed to prove that they were not due to infringement.

up at least a portion of third party buyers,[132] were confused about the manufacturers when purchasing or overhauling servos with the RSA Marks, as their decisions are made based upon the servo's part number—which are distinct between AVStar and Precision servos. Because an award of disgorged profits in the amount of $264,818 more than fully compensates TNB for any infringement, trebling of damages is not warranted.

Despite this conclusion, TNB requests that this Court to stray beyond the "clear limit[s placed] on [its] discretionary power" by increasing the monetary judgment as a punitive measure, rather than as a compensatory measure.[133] The fact that Precision bases its request on punitive measures is made clear by TNB's statement that trebled damages are warranted "as a deterrent alone" based on the "egregiousness" of Avco's litigation position over the course of a decade, and its willful infringement.[134] However, this ignores clear guidance from the Third Circuit, which has stated "that deterrence is not a compensatory reason" and "cannot serve as a basis for an enhanced award."[135] There is no non-punitive reason to enhance the disgorged profits awarded to TNB, and the Court therefore declines TNB's request for trebled damages.

---

[132] *See* Doc. 605 at 83-84.
[133] *Max Rack*, 40 F.4th at 473.
[134] Doc. 619 at 23.
[135] *Kars 4 Kids*, 8 F.4th at 225 n.22.

### 3.    Punitive Damages

Turning to the question of whether punitive damages should be awarded, the Court concludes that such damages are inappropriate. As discussed previously, punitive damages are warranted only in the most extreme circumstances after considering three factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant.[136] Those factors weigh against the imposition of punitive damages.

First, the character of the act here is, relatively speaking, innocuous. As the United States Supreme Court has emphasized, "[t]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[137] In assessing the reprehensibility of a party's conduct, courts should consider "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."[138]

Here, any harm caused—if indeed there was any harm at all—was modest and economic only, and involved no physical harm. While Avco's actions evidenced a

---

[136] *End Zone, Inc.*, 259 A.3d at 487.

[137] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (internal quotation marks omitted).

[138] *Id.*

reckless disregard of TNB's trademark rights, there was no indifference to the health or safety of others. Moreover, TNB and Precision did not have any particular financial vulnerability but were, and remain today, solvent and fairly successful companies. Although the conduct was ongoing, and the harm was the result of, at a minimum, Avco's reckless conduct, the character of the tortious act as a whole is not sufficiently reprehensible to support the imposition of punitive damages.

Second, the nature and extent of the harm is fairly small, if it exists at all. As discussed previously, the Court cannot conclude that TNB lost any sales due to Avco's conduct, meaning there is no real harm here. And even counting the $264,818 in disgorged profits from AVStar as harm to Precision, that harm is economic in nature and minor, given that Precision generates sales that regularly exceed five million dollars per year.[139]

The third consideration does weigh in favor of awarding punitive damages, as Avco is a large company, owned by an even larger and highly profitable company, Textron. However, that single factor does not outweigh the fact that Avco and AVStar's actions were not of a character that would warrant punitive damages, nor was the harm to TNB or Precision significant enough to warrant such damages. Although Avco's actions were willful and undeniably infringed on TNB's rights, "to award punitive damages here would be an overreach of [the Court's] judicial

---

[139] TNB Bench Trial Exhibit 435.

responsibility to do justice," and TNB's request for punitive damages must be denied.[140]

### 4.    Attorneys' Fees

Finally, the Court turns to the question of whether to award attorneys' fees for TNB. As an initial matter, Avco correctly argues that the issue of attorneys' fees is not properly before the Court.[141] As the United States Court of Appeals for the Fourth Circuit has explained, Federal Rule of Civil Procedure 54 "require[s] that [any] claim for attorneys' fees be made by motion" unless the law undergirding the plaintiff's substantive claims "'requires those fees to be proved at trial as an element of damages.'"[142] Moreover, with limited exceptions, Rule 54 requires that a plaintiff "submit a motion for attorneys' fees between 0-14 days *after* the district court issue[s] its order" disposing of the case.[143]

Here, the Lanham Act does not require that attorneys' fees or other expenses be proved at trial as an element of damages, nor does any statute or court order provide that a request for attorneys' fees may be presented prior to the entry of judgment. Accordingly, TNB's request for attorneys' fees is procedurally improper. Nevertheless, because, as explained below, the Court concludes that attorneys' fees are not warranted, it will address TNB's request at this time.

---

[140] *Mifflinburg Tel., Inc. v. Criswell*, 277 F. Supp. 3d 750, 806 (M.D. Pa. 2017).

[141] Doc. 618 at 46-47.

[142] *Brown & Pipkins, LLC v. Serv. Emps. Int'l Union*, 846 F.3d 716, 730 (4th Cir. 2017) (quoting Fed. R. Civ. P. 54(d)(2)(A)).

[143] *Id.*

Under the Lanham Act, attorneys' fees are warranted only "in exceptional cases," which occur "when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'"[144]

As to the first consideration, the Court cannot find that there was an unusual discrepancy in the merits of the positions taken here by Avco and TNB. It is true that the merits of Avco's position as to infringement were relatively weak; this Court granted summary judgment in TNB's favor, finding trademark infringement as a matter of law,[145] and later held that Avco was not entitled to present at trial evidence that Avco/AVStar believed they were entitled to use the RSA Marks on servos, as such evidence "would establish, at most, that Avco buried its head in the sand when presented with evidence that it could not use the RSA Marks."[146] Furthermore, the jury concluded that Avco and AVStar's infringement was willful,[147] which must "play a role in a district court's analysis of the 'exceptionality' of a case."[148] This tends to demonstrate that Avco's litigation position as to infringement was relatively weak, although this is offset to some extent by the fact that TNB was twice denied a

---

[144] *Fair Wind Sailing*, 764 F.3d 303 at 315 (quoting *Octane Fitness*, 572 U.S. at 554).
[145] Docs. 356, 357.
[146] Doc. 526 at 10-11.
[147] Doc. 579.
[148] *Fair Wind Sailing*, 764 F.3d 303 at 315.

preliminary injunction based in part on the conclusion that TNB had failed to establish a likelihood of success on the merits of its infringement claims.[149]

Even assuming that there was a significant disparity in the parties' positions on the merits as to infringement, Avco's position as to damages—which is frankly the heart of any civil litigation—was strong and, if there were any disparity in the parties' positions in that respect, it was—as discussed above—TNB that had the far weaker position. Not only did TNB fail to prove any lost profits, but Avco was able to demonstrate that the vast majority of its and AVStar's profits were not attributable to use of the RSA Marks. This success in the damages phase of this case militates against finding that there is an unusual discrepancy in the merits of the positions taken by the parties such that this may be termed an "exceptional" case where attorneys' fees are warranted.

Turning then to the question of whether this case is exceptional based upon Avco having litigated this case in an unreasonable manner, the Court again determines that the answer is no. The docket, to which TNB cites at length,[150] supports the notion that this matter was thoroughly and exhaustively litigated between parties who did not like each other.[151] The parties litigated matters

---

[149]  Doc. 60 at 4-9; Doc. 145 at 9-12.
[150]  Doc. 613 at 44-48.
[151]  This animus appears to have extended to the attorneys involved in the early stages of this case. Attorneys at Crowell & Moring entered their appearance in this matter in 2017, replacing Avco's prior attorneys and, in the Court's view, the relationship between counsel improved markedly after this change in attorneys.

extensively, which was in part responsible for this case continuing for more than a decade without resolution. These disputes included whether AVStar should be joined as a party to this matter, TNB's motion to intervene, a motion to dismiss, motions to strike and for sanctions, discovery disputes, and issues with expert reports.

While Avco was often unsuccessful in these disputes, it was also often successful, for example, winning in part a motion to strike a portion of TNB's answer and counterclaims, two motions for a protective order, and a motion for sanctions.[152] TNB was often equally unsuccessful in disputes placed before the Court, having been denied a preliminary injunction on three occasions and a permanent injunction once, and losing, for example, motions for sanctions and to strike an expert rebuttal report.[153]

And while it is true that Magistrate Judge Karoline Mehalchick described the discovery issues in this case as "the most vitriolic and adversarial discovery dispute I have ever been involved with, either in practice or in the Court in this position,"[154] both parties were equally responsible for those issues. Indeed, the hearing in which Magistrate Judge Mehalchick made the aforementioned statement arose when attorneys for both parties got "into a physical altercation over a servo" at a deposition; both attorneys claimed to have been "bloodied up" during this

---

[152] Docs. 69, 213, 240, 315, 316.
[153] Docs. 60, 145, 315, 316, 394, 420.
[154] Doc. 245 at 6.

encounter.[155] Moreover, both parties were directed to provide fuller discovery in this matter, emphasizing that these discovery disputes were hardly one-sided.[156]

Given that both parties fully litigated this matter in nearly every conceivable manner, and that both parties were at times successful and at times unsuccessful in their requests and disputes, the Court cannot conclude that Avco's method of litigating this matter was so unreasonable that attorneys' fees are warranted. In short, although this matter was certainly contentious, it was not "exceptional" as required under the Lanham Act.[157]

## IV.   CONCLUSION

In accordance with the above discussion, Avco infringed on TNB's trademarks, and TNB is entitled to some limited damages. At bottom, this case is relatively simple. Although the creation of AVStar and its reverse engineering of Precision's servos—an act that did not violate TNB's or Precision's rights—directly and substantially harmed Precision, and although Avco and AVStar violated TNB's trademarks, those acts are separate and distinct.

---

[155] *Id.* at 4, 6.

[156] Doc. 186.

[157] TNB also requests costs and interest. Doc. 613 at 48. As the Third Circuit has noted, "[t]he Lanham Act allows a prevailing plaintiff to recover costs . . . as a matter of course." *Green v. Fornario*, 486 F.3d 100, 103 (3d Cir. 2007). Nevertheless, TNB has provided insufficient information for the Court to determine what costs should be awarded in this matter. The Court therefore defers any decision on an award of costs, other than attorneys' fees which are denied, pending further briefing. TNB may file a motion seeking such costs, along with a detailed breakdown of those costs, within fourteen days of the date that these Findings of Fact and Conclusions of Law are entered.

Avco's use of the RSA Marks did not harm TNB. Rather, any harm came from the creation of a competitive servo manufacturer that took a substantial amount of Precision's servo business for reasons other than any use of the RSA Marks. Ultimately, Avco and AVStar sold servos bearing the RSA Marks "knowing of plaintiff's mark, but it appears this was done not as an attempt to profit from the mark but rather in simple disregard of plaintiff's rights."[158] Such actions do not warrant an award of damages beyond $264,818 in AVStar profits that will be disgorged. Consequently, Judgment will be entered in favor of TNB in the sum of $264,818.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[158] *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 350 (5th Cir. 2002) (brackets and internal quotation marks omitted).